*413 Justice Kennedy
delivered the opinion of the Court.
It is well settled that “a State cannot condition public employment on a basis that infringes the employee’s constitutionally protected interest in freedom of expression.” Connick v. Myers, 461 U. S. 138, 142 (1983). The question presented by the instant case is whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee’s official duties.
I
Respondent Richard Ceballos has been employed since 1989 as a deputy district attorney for the Los Angeles County District Attorney’s Office. During the period relevant to this case, Ceballos was a calendar deputy in the office’s Pomona branch, and in this capacity he exercised certain supervisory responsibilities over other lawyers. In February 2000, a defense attorney contacted Ceballos about a pending criminal case. The defense attorney said there were inaccuracies in an affidavit used to obtain a critical search warrant. The attorney informed Ceballos that he *414 had filed a motion to traverse, or challenge, the warrant, but he also wanted Ceballos to review the case. According to Ceballos, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases.
After examining the affidavit and visiting the location it described, Ceballos determined the affidavit contained serious misrepresentations. The affidavit called a long driveway what Ceballos thought should have been referred to as a separate roadway. Ceballos also questioned the affidavit’s statement that tire tracks led from a stripped-down truck to the premises covered by the warrant. His doubts arose from his conclusion that the roadway’s composition in some places made it difficult or impossible to leave visible tire tracks.
Ceballos spoke on the telephone to the warrant affiant, a deputy sheriff from the Los Angeles County Sheriff’s Department, but he did not receive a satisfactory explanation for the perceived inaccuracies. He relayed his findings to his supervisors, petitioners Carol Najera and Frank Sundstedt, and followed up by preparing a disposition-memorandum. The memo explained Ceballos’ concerns and recommended dismissal of the case. On March 2,2000, Ceballos submitted the memo to Sundstedt for his review. A few days later, Ceballos presented Sundstedt with another memo, this one describing a second telephone conversation between Ceballos and the warrant affiant.
Based on Ceballos’ statements, a meeting was held to discuss the affidavit. Attendees included Ceballos, Sundstedt, and Najera, as well as the warrant affiant and other employees from the sheriff’s department. The meeting allegedly became heated, with one lieutenant sharply criticizing Ceballos for his handling of the case.
Despite Ceballos’ concerns, Sundstedt decided to proceed with the prosecution, pending disposition of the defense motion to traverse. The trial court held a hearing on the motion. Ceballos was called by the defense and recounted *415 his observations about the affidavit, but the trial court rejected the challenge to the warrant.
Ceballos claims that in the aftermath of these events he was subjected to a series of retaliatory employment actions. The actions included reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion. Ceballos initiated an employment grievance, but the grievance was denied based on a finding that he had not suffered any retaliation. Unsatisfied, Ceballos sued in the United States District Court for the Central District of California, asserting, as relevant here, a claim under Rev. Stat. § 1979, 42 U. S. C. § 1983. He alleged petitioners violated the First and Fourteenth Amendments by retaliating against him based on his memo of March 2.
Petitioners responded that no retaliatory actions were taken against Ceballos and that all the actions of which he complained were explained by legitimate reasons such as staffing needs. They further contended that, in any event, Ceballos’ memo was not protected speech under the First Amendment. Petitioners moved for summary judgment, and the District Court granted their motion. Noting that Ceballos wrote his memo pursuant to his employment duties, the court concluded he was not entitled to First Amendment protection for the memo’s contents. It held in the alternative that even if Ceballos’ speech was constitutionally protected, petitioners had qualified immunity because the rights Ceballos asserted were not clearly established.
The Court of Appeals for the Ninth Circuit reversed, holding that “Ceballos’s allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment.” 361 F. 3d 1168, 1173 (2004). In reaching its conclusion the court looked to the First Amendment analysis set forth in Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563 (1968), and Connick, supra. Connick instructs courts to begin by considering *416 whether the expressions in question were made by the speaker “as a citizen upon matters of public concern.” See id., at 146-147. The Court of Appeals determined that Ceballos’ memo, which recited what he thought to be governmental misconduct, was “inherently a matter of public concern.” 361 F. 3d, at 1174. The court did not, however, consider whether the speech was made in Ceballos’ capacity as a citizen. Rather, it relied on Circuit precedent rejecting the idea that “a public employee’s speech is deprived of First Amendment protection whenever those views are expressed, to government workers or others, pursuant to an employment responsibility.” Id., at 1174-1175 (citing cases including Roth v. Veteran’s Admin. of Govt. of United States, 856 F. 2d 1401 (CA9 1988)).
Having concluded that Ceballos’ memo satisfied the public-concern requirement, the Court of Appeals proceeded to balance Ceballos’ interest in his speech against his supervisors’ interest in responding to it. See Pickering, supra, at 568. The court struck the balance in Ceballos’ favor, noting that petitioners “failed even to suggest disruption or inefficiency in the workings of the District Attorney’s Office” as a result of the memo. See 361 F. 3d, at 1180. The court further concluded that Ceballos’ First Amendment rights were clearly established and that petitioners’ actions were not objectively reasonable. See id., at 1181-1182.
Judge O’Scannlain specially concurred. Agreeing that the panel’s decision was compelled by Circuit precedent, he nevertheless concluded Circuit law should be revisited and overruled. See id., at 1185. Judge O’Scannlain emphasized the distinction “between speech offered by a public employee acting as an employee carrying out his or her ordinary job duties and that spoken by an employee acting as a citizen expressing his or her personal views on disputed matters of public import.” Id., at 1187. In his view, “when public employees speak in the course of carrying out their routine, required employment obligations, they have no personal in *417 terest in the content of that speech that gives rise to a First Amendment right.” Id., at 1189.
We granted certiorari, 543 U. S. 1186 (2005), and we now reverse.
II
As the Court’s decisions have noted, for many years “the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment — including those which restricted the exercise of constitutional rights.” Connick, 461 U. S., at 143. That dogma has been qualified in important respects. See id., at 144-145. The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee’s right, in certain circumstances, to speak as a citizen addressing matters of public concern. See, e. g., Pickering, supra, at 568; Connick, supra, at 147; Rankin v. McPherson, 483 U. S. 378, 384 (1987); United States v. Treasury Employees, 513 U. S. 454, 466 (1995).
Pickering provides a useful starting point in explaining the Court’s doctrine. There the relevant speech was a teacher’s letter to a local newspaper addressing issues including the funding policies of his school board. 391 U. S., at 566. “The problem in any case,” the Court stated, “is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Id., at 568. The Court found the teacher’s speech “neither [was] shown nor can be presumed to have in any way either impeded the teacher’s proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally.” Id., at 572-573 (footnote omitted). Thus, the Court concluded that “the interest of the school administration in limiting teachers’ opportunities to contribute to public debate is not significantly *418 greater than its interest in limiting a similar contribution by any member of the general public.” Id., at 573.
Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See id., at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer’s reaction to the speech. See Connick, supra, at 147. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See Pickering, 391 U. S., at 568. This consideration reflects the importance of the relationship between the speaker’s expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity’s operations.
To be sure, conducting these inquiries sometimes has proved difficult. This is the necessary product of “the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors ... to furnish grounds for dismissal.” Id., at 569. The Court’s overarching objectives, though, are evident.
When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. See, e. g., Waters v. Churchill, 511 U. S. 661, 671 (1994) (plurality opinion) (“[T]he government as employer indeed has far broader powers than does the government as sovereign”). Government employers, like private employers, need a significant degree of control over their employees’ words and actions; without it, there would be little chance for the efficient provision of public services. Cf. Connick, *419 supra, at 143 (“[Government offices could not function if every employment decision became a constitutional matter”). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.
At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See Perry v. Sindermann, 408 U. S. 593, 597 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, e.g., Connick, supra, at 147 (“Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government”).
The Court’s employee-speech jurisprudence protects, of course, the constitutional rights of public employees. Yet the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public’s interest in receiving the well-informed views of government employees engaging in civic discussion. Pickering again provides an instructive example. The Court characterized its holding as rejecting the attempt of school administrators to “limi[t] teachers’ opportunities to contribute to public debate.” 391 U. S., at 573. It also noted that teachers are “the members of a community most likely to have informed and definite opinions” about school expenditures. Id., at 572. The Court’s approach acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed. The Court’s more recent cases have expressed similar con *420 cerns. See, e. g., San Diego v. Roe, 543 U. S. 77, 82 (2004) (per curiam) (“Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public’s interest in receiving informed opinion as it is the employee’s own right to disseminate it” (citation omitted)); cf. Treasury Employees, 513 U. S., at 470 (“The large-scale disincentive to Government employees’ expression also imposes a significant burden on the public’s right to read and hear what the employees would otherwise have written and said”).
The Court’s decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. See, e. g., Rankin, 483 U. S., at 384 (recognizing “the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment”). Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to “constitutionalize the employee grievance.” Connick, 461 U. S., at 154.
Ill
With these principles in mind we turn to the instant case. Respondent Ceballos believed the affidavit used to obtain a search warrant contained serious misrepresentations. He conveyed his opinion and recommendation in a memo to his supervisor. That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work. See, e. g., Givhan v. Western Line Consol. School Dist., 439 U. S. 410, 414 (1979). Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public *421 employees like “any member of the general public,” Pickering, 391 U. S., at 573, to hold that all speech within the office is automatically exposed to restriction.
The memo concerned the subject matter of Ceballos’ employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker’s job. See, e. g., ibid.; Givhan, supra, at 414. As the Court noted in Pickering: “Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.” 391 U. S., at 572. The same is true of many other categories of public employees.
The controlling factor in Ceballos’ case is that his expressions were made pursuant to his duties as a calendar deputy. See Brief for Respondent 4 (“Ceballos does not dispute that he prepared the memorandum ‘pursuant to his duties as a prosecutor’”). That consideration — the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case— distinguishes Ceballos’ case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significánt point is that the memo was written pursuant to Ceballos’ official duties. Restricting speech that owes its existence to a public employee’s professional responsibilities does not infringe *422 any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 833 (1995) (“[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes”)- Contrast, for example, the expressions made by the speaker in Pickering, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.
Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.
This result is consistent with our precedents’ attention to the potential societal value of employee speech. See supra, at 419-420. Refusing to recognize First Amendment claims based on government employees’ work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit.
Our holding likewise is supported by the emphasis of our precedents on affording government employers sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure *423 that their employees’ official communications are accurate, demonstrate sound judgment, and promote the employer’s mission. Ceballos’ memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff’s department. If Ceballos’ superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action.
Ceballos’ proposed contrary rule, adopted by the Court of Appeals, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.
The Court of Appeals based its holding in part on what it perceived as a doctrinal anomaly. The court suggested it would be inconsistent to compel public employers to tolerate certain employee speech made publicly but not speech made pursuant to an employee’s assigned duties. See 361 F. 3d, at 1176. This objection misconceives the theoretical underpinnings of our decisions. Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see Pickering, supra, or discussing politics with a co-worker, see Rankin, *424 483 U. S. 378. When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.
The Court of Appeals’ concern also is unfounded as a practical matter. The perceived anomaly, it should be noted, is limited in scope: It relates only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like Pickering and Connick) that are made outside the duties of employment. If, moreover, a government employer is troubled by the perceived anomaly, it has the means at hand to avoid it. A public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public.
Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee’s expressions made pursuant to official responsibilities. Because Ceballos’ memo falls into this category, his allegation of unconstitutional retaliation must fail.
Two final points warrant mentioning. First, as indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee’s duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees’ rights by creating excessively broad job descriptions. See post, at 431, n. 2 (Souter, J., dissenting). The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is *425 expected to perforin, and the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee’s professional duties for First Amendment purposes.
Second, Justice Souter suggests today’s decision may have important ramifications for academic freedom, at least as a constitutional value. See post, at 438-439. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court’s customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.
IV
Exposing governmental inefficiency and misconduct is a matter of considerable significance. As the Court noted in Connick, public employers should, “as a matter of good judgment,” be “receptive to constructive criticism offered by their employees.” 461 U. S., at 149. The dictates of sound judgment are reinforced by the powerful network of legislative enactments — such as whistle-blower protection laws and labor codes — available to those who seek to expose wrongdoing. See, e. g., 5 U. S. C. § 2302(b)(8); Cal. Govt. Code Ann. §8547.8 (West 2005); Cal. Lab. Code Ann. §1102.5 (West Supp. 2006). Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment. See, e.g., Cal. Rule Prof. Conduct 5-110 (2005) (“A member in government service shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause”); Brady v. Maryland, 373 U. S. 83 (1963). These imperatives, as well as obligations arising from any *426 other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions.
We reject, however, the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties. Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.
The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

It is so ordered.