IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 16, 2007

Charles R. Fulbruge III
Clerk

No. 06-31112

LARRY W. DENDY, SR.,

Plaintiff-Appellant,

v.

HARRY LEE, Sheriff;
JAMES MILLER, Deputy Chief,
Individually and in Their Official Capacities,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:05-CV-1329

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Larry Dendy was fired from his position as a maintenance sergeant at the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Jefferson Parish Correctional Center. Alleging that he was dismissed as retaliation for his constitutionally protected speech, he sued Harry Lee, Sheriff of Jefferson Parish, and James Miller, Deputy Chief of the Internal Affairs Division ("IAD") of the sheriff's office, in their individual and official capacities, pursuant to 28 U.S.C. § 1981. Lee and Miller moved for summary judgment, and Dendy filed a Federal Rule of Civil Procedure 56(f) request for discovery.

The district court denied Dendy's request and granted summary judgment. Because Dendy cannot show a causal connection between his allegedly protected speech and the adverse employment decision, or that the district court abused its discretion in denying the rule 56(f) request, we affirm.

I.

Dendy was a maintenance sergeant at the correctional center. He was repeatedly questioned by the Federal Bureau of Investigation ("FBI") and IAD concerning intimate details of his lifeSSincluding why his home had been searched for child pornography, whether he lived with his wife or his mistress, whether a stash of illegal drugs belonged to him or his daughter (or his daughter's boyfriend), and why he had admitted he had lied to the FBI. One particular topic, however, concerned the public interest: allegedly corrupt bail bond practices at the jail where Dendy worked (and the possibility that he surreptitiously had slipped a bail bondsmen a key to the jail).

The questioning began in December 2003 when a pair of FBI agents interviewed Dendy, informing him that they had received information that he would have details about the jail's bail bond corruption. Dendy denied having any such knowledge, then reported the questioning to the jail's warden.

On January 8, 2004, three agents questioned Dendy outside a grand jury

hearing at which he was scheduled to testify.[1]  They explained that they had been advised that Dendy had given a jail key to a bail bondsman.  Dendy stated that that did not happen.  Dendy again reported the questioning to the warden, who referred Dendy to IAD.  On January 9, Miller questioned Dendy, who again denied giving a bondsman a key.  Dendy passed a polygraph examination.

On January 22, pursuant to a warrant, FBI agents searched Dendy's house for child pornography.  The agents found pornographic images on Dendy's computer[2] but determined that they had been inadvertently downloaded by his daughter.  During the search, the agents discovered marihuana (and Dendy's daughter's boyfriend hiding beneath a bed).  Dendy claimed the drugs were his and that he had found them outside the jail and took them home.  The agents indicated that because it was not a large stash, if Dendy would give them information about the bail bond investigation, the drug possession would not be pursued.  Dendy again denied he had any information about illegal bail bond practices.

Later that day, the FBI told the sheriff's office of the search.  Miller questioned Dendy about it and asked for a list of what had been seized.  Dendy at first only produced a copy of the search warrant affidavit, not the search warrant return, but, after being pressed, he produced a copy of the return.  Miller saw that marihuana was listed; Dendy admitted that the FBI had seized the drugs and that he had told the agents the drugs were his.

Dendy then told a different story to Miller: that he had lied to the FBI because he wanted to protect his daughter.  According to Dendy, Miller and Lee accepted the revised version to be accurate and said that if he would tell the FBI the truth, there would be "no consequences" for his employment.

In that interview, according to Dendy, Miller also asked Dendy about the

---

[1] Dendy, however, did not testify.

[2] It is hard to tell from the record whether the images were child pornography; Dendy's wife appears to have informed the sheriff's office that they were not.

bail bond investigation. Dendy stated that Miller "angrily demanded" to know why he had told the FBI that IAD had questioned him about the key. Dendy had not yet shared with the FBI that IAD had asked about the FBI's questions.

On January 23, Dendy went to the FBI and recanted his original story. During that interview, Dendy claimed that the FBI agents, without prompting, "angrily told him that it would have been better if he had not mentioned the FBI interest in the jail key to Miller." Dendy responded that he could not keep secrets from his supervisors.

On February 3, IAD gave Dendy another polygraph examination. The examiner determined that Dendy was truthful in denying that he had supplied a jail key to a bail bondsman but that his denial of prior knowledge of the marihuana was deceptive. Dendy could not explain why the examiner reached that conclusion.[3]

The next day, Dendy was given a third polygraph examination, concerning whether he had either taken contraband, including marihuana, into the jail or had brought contraband home from the jail. He failed the third exam: The examiner determined that he was again being deceptive. The examiner suggested, however, that the result of the third exam was less reliable because Dendy may have been "sensitized" by the results of the previous ones.

After the third exam, Dendy admitted to IAD that he had stayed at his house in Marrero with his wife and daughter only two or three nights a week and that he actually lived in Hammond, Louisiana, with his girlfriend. He had never updated his personnel file to reflect that fact.

Dendy's wife was also apparently questioned on February 4. She informed IAD that Dendy's daughter had confided to her that some drugs in the house belonged to the daughter and the daughter's boyfriend but that the daughter did

---

[3] Dendy says that he advised IAD that if he could rest, he would be able to pass the test. IAD declined to re-administer the test.

not admit that all the drugs belonged to her. Dendy's wife also confirmed that Dendy spent most nights away from the Marrero house.

On March 10, the FBI delivered a report to IAD detailing the search of Dendy's Marrero house. The report reaffirmed the FBI's determination that the pornography was downloaded inadvertently and that Dendy stayed at his Marrero house only "sparingly." The report also summarized the FBI's interviews with Dendy's family regarding the drugs, noting that Dendy's wife said that Dendy used to smoke marihuana and that his daughter had stated that she found drugs in Dendy's shaving kit the previous year.[4] The daughter's boyfriend reportedly stated that he also had seen marihuana in the shaving kit, which Dendy usually took with him to work.

Likewise, the report summarized what Dendy told the agents on the day of the search: (1) that the "weed" on the premises was his; (2) that "he smoked it to calm his nerves;" (3) that he found it outside the jail the previous year; and (4) how much marihuana the agents would find. The FBI report also said that when Dendy returned to the FBI to recant his statement that he owned the drugs, he said the drugs' real owner was his daughter's boyfriend.[5]

The FBI report also reflected that Dendy had spoken with IAD about the key and the FBI investigation before January 22. When the FBI agents delivered the report to IAD on March 10, IAD asked the agents whether the FBI had

---

[4] Dendy argues that his daughter's statement should not be believed because she was attempting to put all the blame on him, but that she admitted to her mother that at least some drugs belonged to her.

[5] There is a dispute whether Dendy told Miller on January 22 that he had lied to the FBI because he wanted to protect his daughter but the drugs really belonged to his daughter's boyfriend, or whether Dendy told Miller the drugs belonged to his daughter. IAD's case report indicated that Dendy had said that the drugs were his daughter's, but Dendy says he consistently told IAD that the drugs were the boyfriend's. In Dendy's original brief to this court, he states that Miller and Lee "accepted his [i.e. Dendy's] explanation that his daughter owned" the drugs, but in his reply brief he says that he never told IAD that the drugs were his daughter's.

expressed dissatisfaction with Dendy concerning IAD's questioning of Dendy. The agents ignored the question.

On March 11, Miller and Dendy met again; it is uncertain what exactly was said. According to a report prepared by Miller dated April 1, "a 47-page statement was obtained from" Dendy at that meeting. Miller stated in that report regarding the meeting that "Dendy is still untruthful with his answers as it relates to the marijuana." Miller's report also states that during that meeting, Dendy "correct[ed] the comments in the FBI [report] that Deputy Chief Miller or Lieutenant A. Ulmer had not spoken with or interviewed Sergeant Dendy prior to 1/22/04 or had any idea that Sergeant Dendy was of interest in a federal investigation."

On March 23, a case report was submitted by Lieutenant Ulmer of the sheriff's office to IAD detailing the information then known about Dendy. Ulmer recommended that Dendy be found to have violated three provisions of the Sheriff's Office's Code of Conduct: (1) Article 29, "Truthfulness," for lying to investigators; (2) Article 74, "Residence, Telephone, and Reporting Change" for failing to report his change of address; and (3) Article 27, "Adherence to Law," for drug possession. Those recommendations were approved by the relevant actors in the sheriff's office, with Miller's approval coming last, on March 29.

On March 30, Ulmer supplemented the case report, noting that the United States Attorney's Office ("USAO") had contacted the sheriff's office to say that the Department of Justice would not prosecute Dendy for marihuana possession if IAD terminated Dendy's employment. The date on which the USAO contacted the sheriff's office is uncertain, but an IAD document prepared by Miller stated that the contact was after March 10.

On April 1, Miller submitted a report concurring in Ulmer's recommendation. Miller noted that "Dendy was interviewed five . . . times and has continuously lied in each statement regarding the marijuana seized . . . ." Miller stated

6

that the information IAD had compiled "clearly show[ed] that Sergeant Dendy was deceptive . . . ." Miller's report also noted that Dendy's family told the agents that the marihuana was Dendy's. Relying primarily on Dendy's drugs and liesSSand not on the failure to report his address changeSSMiller's report recommended that Dendy's employment end immediately.

In Miller's report, however, there was again a brief mention of the FBI's questioning of Dendy about the key. Miller noted that "if the key is real, the FBI should have given that information to [the sheriff's office] so the integrity of the security system is not breached" and that the FBI agents who turned over the report about Dendy ignored IAD's questions. No other part of Miller's report mentions the key or the bail bond investigation.

On April 30, Lee sent a letter terminating Dendy's employment. The termination letter listed the three violations of the Code of Conduct as grounds for Dendy's dismissal. Later, at Dendy's hearing for unemployment benefits, Miller stated that Dendy had been fired for "playing both ends against the middle."

Dendy sued, alleging that the Code of Conduct was just a pretext and that he was really fired in retaliation for speech protected by the First Amendment.[6] Lee and Miller moved for summary judgment. In response, Dendy filed a rule 56(f) request, contending that he needed certain discovery before he could appropriately respond to the motion for summary judgment. The district court denied the request and granted summary judgment.

## II.

We review a summary judgment de novo, applying the same standard as did the district court. See, e.g., TIG Ins. Co. v. Sedgwick James, 276 F.3d 754, 759 (5th Cir. 2002). A summary judgment will be affirmed "only if 'the plead-

---

[6] Dendy also claimed that he was terminated without due process, but he abandoned that claim before the district court ruled on the summary judgment motion.

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the light most favorable to the non-movant, 'show that there is no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). Although the "court must draw all justifiable inferences in favor of the non-moving party," a genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

"[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine issue of material fact for trial." TIG, 276 F.3d at 759 (quoting Celotex, 477 U.S. at 325). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Id. We review the denial of a rule 56(f) request for abuse of discretion. See, e.g., Adams v. Travelers Indem. Co., 465 F.3d 156, 161 (5th Cir. 2006).

## III.

To establish First Amendment retaliation, Dendy must show that (1) he suffered an "adverse employment decision;" (2) his speech involved "a matter of public concern;" (3) his "interest in commenting on matters of public concern . . . outweigh[s] the Defendant's interest in promoting efficiency;" and (4) his "speech motivated the adverse employment decision." Beattie v. Madison County Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001). If these four elements are met, "the burden shifts to defendants to show by a preponderance of the evidence that they

would have come to the same conclusion in the absence of the protected conduct." Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The district court concludedSSand the parties do not disputeSSthat Dendy suffered an adverse employment action. The district court likewise decided that the bail bond issue was a matter of public concern potentially protected by the First Amendment.[7] The court found it unnecessary to balance Dendy's interest against that of the sheriff's office, because the court ruled there was no genuine issue of material fact as to whether Dendy's speech motivated or caused the adverse employment decision. Dendy argues that that ruling on the causation element was error.

Other than the time line presented above[8] and a few instances in which the FBI and IAD allegedly expressed irritation regarding Dendy's communications with investigators about the respective investigationsSSwhich evidence is not enough to withstand summary judgment[9]SSDendy proffers two pieces of evidence to demonstrate that his disclosures to the FBI and IAD about the bail bond investigations motivated the termination of his employment.[10] First, he

---

[7] Whether this holding is correct in light of Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), is not before us, and we express no opinion.

[8] That evidence, as a matter of law, is insufficient standing alone to support Dendy's claim. Beattie, 254 F.3d at 605 ("Timing alone does not create an inference that termination is retaliatory.").

[9] Although occasional bureaucratic infighting may have occurred, Dendy has failed to produce any specific evidence from which a reasonable jury could find that any infighting led to his termination. Any connection between the inter-agency irritation and Dendy's firing is far too speculative, especially given that each instance of inter-agency tension occurred in situations specifically focusing on Dendy's guilt of serious offenses, with the inter-agency feuding emergingSSat mostSSas a side-topic.

[10] Dendy's brief is not pellucid as to the reasons IAD and the FBI would want to retaliate against him for his speech. Dendy argues that Miller "had ample reason to retaliate because Dendy had blown the whistle on [Miller's] premature interest in the bail bond investiga-
(continued...)

argues that Miller's phrase during Dendy's unemployment-benefits hearingSSthat Dendy was fired for "playing both ends against the middle"SSmeans that the real reason he was dismissed was his respective disclosures to the FBI and IAD about bail-bond practices. Dendy goes so far as characterize Miller's statement as an admission of causation.

Second, Dendy relies on the statement of the USAO that the drug charges would be dropped if Dendy were fired. From this, Dendy contends the federal government wanted to retaliate against him and convinced the sheriff's office to comply with the government's wishes.

Regarding Dendy's first proferred evidence, no reasonable jury could conclude, from Miller's statement that Dendy was fired for "playing both ends against the middle," that he was dismissed for making disclosures to the FBI

---

[10] (...continued)
tion . . . well before Miller . . . had an independent interest in any investigation into Dendy on January 22." Dendy also avers that "Miller did not re-opened [sic] the marijuana investigation until March 10, when the FBI delivered its . . . report in which Miller learned for the first time that Dendy had spoken to the FBI about Miller's bail bond/key questions before January 22 . . . . It was that bald statement that apparently jumped started the investigation . . . ."

Dendy contends that "Miller [was] very concerned that he [i.e. Miller] not be identified . . . as having spoken to Dendy about the bail bond investigation or known that he was of interest in connection with that investigation prior to January 22." The only reason Dendy offers for why Miller was concerned that the FBI knew that Miller was interested in Dendy's involvement in potential corruption was that "Dendy had blown the whistle on [Miller's] contacting a potential grand jury witness," presumably that potential witness being Dendy.

This scanty explanation, however, is significantly more substantial than is the reason Dendy offers for why the FBI would want to retaliate against him: Dendy's brief explains the FBI's motive as simply "frustration." Dendy argued that the FBI was upset that perhaps he was "leaking" information to potential defendants within the sheriff's office and that Miller "perhaps in a little hot water with 'the feds', was only too happy to give [Dendy] up."

In his briefs to this court, Dendy's explanation for why the USAO wanted to retaliate was that it was "payback time" because Dendy "had both appeared not to cooperate by providing information . . . and had disclosed the FBI interviews . . . ." We are tempted to say that no reasonable jury could find that the causation element of Dendy's First Amendment claim has been met because Dendy has failed to explain the alleged retaliatory animus in more than a conclusional manner. Given, however, that Dendy cannot satisfy the causation element for other reasons, we need not address this matter.

and IAD about the bail bond investigation. Indeed, Dendy offers no support for his idiosyncratic interpretation of Miller's remark: He merely states in conclusional terms that the remark must refer to the bail bond issue. But this single statement is light years from being sufficient evidence to convince a reasonable jury that Dendy was fired for comments relating to jail corruption. Given the overwhelming evidence that Dendy was telling the FBI one thing regarding the drugs and IAD another, the only reasonable way to interpret Miller's statement is to construe it to mean that Dendy's story changed depending on who was asking the questions.

Dendy's second argument fares no better. He contends that because the FBI was upset at him for sharing the fact that the FBI had questioned him with IAD, the USAO contacted the sheriff's department to say that no charges would be filed against Dendy if he were fired. Dendy, however, has produced no evidence that the USAO had any knowledge whatsoever of his communications to the FBI or IAD about the two respective investigations. Without at least some minimal additional evidence connecting the USAO with Dendy's allegedly protected speech, no reasonable jury could conclude that he has established retaliation.[11]

Because no reasonable jury could find, on the basis of the evidence to which Dendy points, that his speech motivated the decision to terminate his employment, summary judgment is proper, and we need not consider whether—if Dendy could have shown causation—Lee and Miller produced sufficient independent evidence to support Dendy's dismissal.

---

[11] Because Dendy has failed to connect the statement from the USAO with his allegedly protected speech, we need not address whether a reasonable jury could conclude that the FBI's alleged retaliatory animus can be imputed to Miller and Lee, who received the USAO's recommendation but ultimately were responsible for the decision to terminate. See Beattie, 254 F.3d at 600 ("To prevail on her First Amendment retaliation claim, Beattie must show either that the school board acted in retaliation or that the improper motives of another actor can be imputed to it.").

IV.

The district court did not abuse its discretion in denying Dendy's rule 56(f) request for additional discovery. The rule provides that "[s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot . . . present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance . . . as is just." In short, "Rule 56(f) allows for further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." Culwell v. City of Fort Worth, 468 F.3d 868, 871 (5th Cir. 2006). "To obtain a continuance of a motion for summary judgment, a party must 'specifically explain both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence.'" Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694, 719 (5th Cir. 1999) (quoting Liquid Drill, Inc. v. Turnkey Exploration, Inc., 48 F.3d 927, 930 (5th Cir. 1995)).

Dendy argues that the district court erred in denying him the production of certain documents from the FBI, a deposition of the Assistant United States Attorney who contacted the sheriff's department about not pressing drug charges if Dendy were fired, the polygraph results, a tape recording of his unemployment benefits hearing, and other like evidence. But nowhere does Dendy explain why the denial of the rule 56(f) request was an abuse of discretion. We have examined Dendy's request to the district court, and at no point did he explain specifically why he had been unable to obtain the materials during the time set for discovery.[12] Given the inadequacy of the rule 56(f) request, the denial was not an

---

[12] It also does not appear that Dendy attached an affidavit to his request. We held in Access Telecom that, consistent with the rule's explicit language, "[u]nder [rule] 56(f), the appropriate way to raise the issue is for the party opposing the motion for summary judgment to file a motion for a continuance with an attached affidavit stating why the party cannot pre-

(continued...)

abuse of discretion.[13]

For the foregoing reasons, the judgment is AFFIRMED.

---

[12] (...continued)
sent by affidavit facts essential to justify the party's opposition." Access Telecom, 197 F.3d at 719.

[13] We recognize that the district court relied on a different reason to deny the rule 56(f) request, but we may affirm on any basis supported by the record. See, e.g., LLEH, Inc. v. Wichita County, 289 F.3d 358, 364 (5th Cir. 2002).