[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15489
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 25, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00701-CV-ORL-19JGG

H. ALAN BURTON,

Plaintiff-Appellant,

versus

CITY OF ORMOND BEACH, FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 25, 2008)**

Before TJOFLAT, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

H. Alan Burton ("Burton") appeals the district court's grant of the City of

Ormond Beach, Florida's ("the City") Federal Rule of Civil Procedure 50(a)

motion for judgment as a matter of law following Burton's case-in-chief at trial. Having thoroughly reviewed the record, we affirm.

BACKGROUND

From May 28, 1996 to August 1, 2005, the City employed Burton as its Director of Leisure Services to generally manage the City's recreation programs and athletic field maintenance. Burton's more specific duties included supervising the City's Recreation Manager, Recreation Supervisors, and several other employees; planning for parks and facilities; preparing the department's budget; addressing citizen groups' (such as the youth baseball and soccer leagues that utilized the City's recreation facilities) concerns about the ballfields; and serving as the liaison to the Recreation Advisory Board ("RAB"), a group of citizens appointed by the City Commission to advise the City on issues related to recreation and the athletic fields. Burton reported to the Assistant City Manager, and Burton's interaction with the City Commission was essentially limited to responding to a Commissioner's request for information.

The City's organizational structure assigned the maintenance of the recreation and athletic facilities to both Leisure Services and another department, Public Works. Leisure Services oversaw the City's athletic fields "inside the fences," but Public Works controlled the parks and maintenance "outside the

2

fences." Generally, if a citizen expressed to Burton a maintenance concern within Public Works's purview, Burton was to submit a work order to Public Works.

In 2005, the City had undertaken review of the entire parks and recreation system. For years, Burton had internally advocated for an integrated system that unified the functions of Leisure Services and Public Works (as opposed to the "hybrid" system in place). But he never advocated a unified system in his official capacity because his duties obligated him to "adhere to the [City's] official position" to retain the hybrid system. In June 2005, the City Manager requested that Burton provide him with a planning recommendation for a forty-acre park in the newly developing Ormond Crossings area. Because Burton believed that the request was improper and exceeded a parks and recreation "master plan" already prepared by outside consultants, Burton did not comply with the request.

On July 24, 2005, Stan Stockhammer ("Stockhammer"), an Ormond Beach resident and director of a baseball league, emailed Burton (and another City employee) and requested that the City do something to prevent foul baseballs from flying into overgrown underbrush near the City's "Nova Field 5" ballfield. Stockhammer suggested the installation of netting to cure the problem. Burton responded by email on July 25 that he would be glad to include the request for netting in the next year's fiscal budget and forward the underbrush issue to Public

3

Works for a work order. Another constituent copied on the emails, Doug Wigley ("Wigley"), responded to Burton's email and stated that the underbrush was a maintenance issue that should be addressed. Burton responded that he would work order the task to Public Works and grounds maintenance.

Later on July 25, John "Rick" Boehm ("Boehm"), a member of the RAB whom Burton copied on his email to Wigley, added his thoughts to the discussion. In an email to Burton, Stockhammer, Wigley, the City Commission, the City Manager and Assistant Manager, and numerous other citizens, Boehm referred to the prior emails between Burton and Stockhammer, criticized the City for under-funding recreation projects and neglecting its sports facilities, and specifically stated that the City's "facilities [we]ren't what they should be." Boehm directly expanded on Burton's original response to Stockhammer that no funding was available to refurbish Nova Field 5 within the next five years.

Concerned about Boehm's email, City Manager Isaac Turner ("Turner"), Assistant City Manager Ted MacLeod ("MacLeod"), and Burton met on July 26 to discuss maintenance of the athletic fields. At the meeting, Turner also expressed anger about Burton's failure to complete the requested recommendation on the Ormond Crossings park. That same day, City Commissioner Bill Partington ("Partington") emailed Turner, suggested that Turner fire Burton, and requested

4

Turner's permission to respond to Boehm's email, to which Turner agreed. On July 27, Partington emailed everyone who had received Boehm's email and suggested that Burton was responsible for the City's mishandling of the funding and maintenance issues that Boehm had raised. Partington also felt that Burton had the authority to address Stockhammer's concerns and failed to do so, instead giving a citizen "the run-a-round from staff." Burton's response to Stockhammer caused Partington to "lose faith in the abilities of the current leadership in leisure services." Lastly, Partington concluded that "a strong re-organization is in order."

On July 29, Burton sent a lengthy responsive email to Partington, the other City Commissioners, Turner, Boehm, Stockhammer, and the other individuals copied on Partington's email. Burton sent the email because "he believed he needed to explain the Leisure Services organization and how it worked; how the City government worked; and how the City actually operated; . . . and to explain how [he] was attempting to improve the system." (Appellant's Br. at 9). The email criticized the City's organizational structure and management and, according to Burton, covered many topics both pertaining to and outside his job function.

The email pointedly noted a "qualitative managerial difference" between Leisure Services and Public Works. Burton mentioned that he was passed over for several promotions, criticized City Manager Turner's performance, and raised the

5

notion that Turner had violated the Florida Sunshine Laws. Burton added that Turner failed to support him as Leisure Services Director and this might be Burton's only chance to speak on the subject as his "opinion ha[d] been muzzled and intimidated by the current City Manager." Burton also stated that Turner's request of Burton to provide the Ormond Crossings recommendation eliminated public participation, betrayed other professionals, and made Burton feel dishonest. Describing Nova Field 5 as "disgraceful and unsafe and nearly unplayable," Burton advised that he had shared his concerns with the City Manager but that "planning for a safe and playable field did not make it on the funded list." Burton concluded the email by stating that the requested work on Nova Field 5 was being performed that day, and that he agreed with a structural re-organization of the entire park and recreation system.

After discussing Burton's email, Turner and MacLeod placed Burton on paid administrative leave. The City terminated him on August 1, 2005, and the termination letter stated only that Burton was an "at-will" employee who could be terminated at any time. Alleging that he was fired for exercising his First Amendment right to freedom of speech on matters of public concern in the July 29, 2005 email, Burton sued the City under 42 U.S.C. § 1983 for retaliation. In denying the City's summary judgment motion, the district court found that

6

Burton's speech addressed a matter of public concern but that a genuine factual issue remained as to whether Burton spoke as a "citizen" or as a "public employee" in the email to Partington.

At trial, Burton testified that the email was a "personal email" expressing his belief in a unified park system regardless of who was in charge, that he was trying to improve the system, and that he mentioned Turner's possible Sunshine Law violation because it disturbed him. Concluding that Burton failed to present sufficient evidence that he spoke as a citizen and not as a public employee, the district court granted the City's mid-trial motion for a directed verdict, from which Burton appeals.

DISCUSSION

We review a district court's grant of a "motion for judgment as a matter of law *de novo*, considering only the evidence that may properly be considered and the reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Rossbach v. City of Miami*, 371 F.3d 1354, 1356 (11th Cir. 2004) (per curiam). "Where no legally sufficient evidentiary basis exists for a reasonable jury to find for that party on that issue, judgment as a matter of law is proper." *Id.* (citation and quotations omitted).

"[W]hen public employees make statements pursuant to their official duties,

7

the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). Following *Garcetti*, we "modified the analysis of the first step . . . for analyzing alleged government employer retaliation to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (per curiam) (citation and footnote omitted).   Whether an employee spoke as a citizen is a question of law for the court.  *See id.* at 1343 ("A court must . . . discern the purpose of the employee's speech."); *Battle v. Bd. of Regents for the St. of Ga.*, 468 F.3d 755, 760 (11th Cir. 2006) (per curiam) (whether the employee spoke as a citizen on a matter of public concern is a threshold legal question); *Morris v. Crow*, 117 F.3d 449, 455 (11th Cir. 1997) (per curiam).

   *Garcetti* instructs that the inquiry into whether an employee spoke as a citizen "is a practical one." *Boyce*, 510 F.3d at 1342 (internal quotation marks and citation omitted).  We consider whether the public employee was acting as a government agent at the time of the speech, and whether the speech "owes its

8

existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960. Essential is whether Burton made his statements to the Commissioner in the capacity of a citizen who did not work for the government. *See Akins v. Fulton County, Ga.*, 278 Fed Appx 964, 970-71 (11th Cir. 2008) (per curiam) (discussing *Garcetti*'s distinction between public employee and citizen).

Although Burton invites us to provide a framework for defining the scope of an employee's professional duties, no "serious debate" exists here about the genesis of Burton's email. The form and context in which Burton responded shows that he sent the email for only one reason: to defend what he perceived as Commissioner Partington's attack on Burton's job performance as Leisure Services Director. Partington's email neither required nor prohibited a response from Burton. Both shocked and hurt by Partington's criticism, and wanting to inform Partington about how he had been trying to improve the system, Burton chose to defend himself against an expression of displeasure with Burton's handling of an issue directly within his job responsibilities. The thrust of Burton's email was that Burton had been unfairly criticized for the work he had done in his job.

Indeed, the first paragraph of Burton's email to Partington addresses head-on Stockhammer's inquiry about Nova Field 5 and the work order Burton issued to Public Works. Burton also discusses the work being completed on several fields

9

"as I write" and his personal observation of such work—all responses to allegations of his deficient job performance. Throughout, Burton refers to himself as "your park and recreation professional" and closes the email by signing "H. Alan Burton, Certified Park and Recreation Professional." (Pl.'s Ex. 4). Burton also mentions Ormond Crossings and the "professional opinion" that was asked of him regarding this project. It is clear that Burton intended to defend his performance directly to Commissioner Partington and the people with whom Burton worked, including the RAB members.

Burton's email also systematically explains how Leisure Services operates within the City's internal structure and system of how athletic fields are maintained. He disagrees with the budgeting process, the organization of the City's departments, and his perceived unfair treatment by the City Manager. And most of these issues Burton had raised internally for many years in his official capacity. We also agree with the district court that Burton's copying of people outside City employment is unpersuasive, as they were not included on his original email chain and his response was clearly directed toward City leadership.

Lastly, it is clear that Turner's possible Sunshine Law violation was not the impetus for Burton's email. Admittedly, Burton responded to Stockhammer, Wigley, and Boehm in his capacity as Leisure Services Director, and the subjects

10

of those emails were part of Burton's official duties. Those emails triggered Partington's attack on Burton's job performance, which Burton defended. We therefore agree with the district court that Burton failed to produce sufficient evidence that he spoke as a "citizen" and not a "public employee."

**AFFIRMED**.