# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA
_____

Case No. 5D2023-2081
LT Case No. 20-5259 TTS
_____

THOMAS CAGGIANO,

    Appellant,

    v.

DUVAL COUNTY SCHOOL BOARD,

    Appellee.

_____


Administrative appeal from the
School Board of Duval County.

Jason E. Bloch, Miami, and Kelly B. Mathis, of Law Office of Kelly B. Mathis, Jacksonville, for Appellant.

Craig D. Feiser, Assistant General Counsel, City of Jacksonville Office of the General Counsel, Jacksonville, for Appellee.

February 21, 2025

MAKAR, J.

Thomas Caggiano taught mathematics in the public school system of Duval County, Florida, for over twenty-five years with positive employment evaluations and no prior discipline. That was until he made politically tinged Facebook posts that led the Duval County School Board to initiate disciplinary charges against him. Caggiano contests the School Board's ruling that two of his posts violated the teacher code of conduct thereby justifying a three-day

suspension, a reprimand, and diversity training. He asserts that the School Board violated his right of free speech under the First Amendment to the United States Constitution.

I.

Around 2008, Caggiano's daughter helped him set up a personal Facebook account, which laid dormant for over a decade, both believing it was on a private rather than public setting. Around the time of the 2020 election, Caggiano made several posts to his account. For reasons not entirely clear, the posts could be publicly viewed. Caggiano claimed that his account was hacked and made public, but no credible evidence supports that view. Caggiano did not use the account for school-related purposes though some teachers had "friended" him and were thereby recipients of his posts.

The School Board asserted that seven of Caggiano's posts violated the teacher code of conduct. The hearing officer characterized the posts/reposts as "memes," describing them as "amusing or interesting pictures, videos, etc., that are spread widely through the internet or social media—or comments to memes or articles." The School Board received a complaint about Caggiano's posts and, after inquiry, claimed that the following seven posts/reposts/comments were sanctionable violations of the teacher code of conduct:

(a) A repost from a Facebook entity called "Messenger of Liberty," which states: "My son is taking part in a social experiment. He has to wear a Bernie 2020 t-shirt for 2 weeks and see how people react. So far he's been spit on, punched and had a bottle thrown at him! I'm curious to see what happens when he goes outside.";

(b) A repost from an individual and an entity called "LIFT — LONG ISLANDERS FOR TRUMP," which states: "Crazy but TRUE, If this girl sees a penis at a party it's a crime . . . [with an accompanying photograph of a young woman], but if this girl sees a penis in the woman's bathroom . . . it's tolerance [with an

2

accompanying photograph of a girl in a bathroom]. Vote Republican and put an end to the madness.";

(c) A post authored by Mr. Caggiano which states: "Dumb ass liberals are now organizing protest against the killing of the Iranian general (terrorist) who was responsible for many attacks against the USA. Amazing how TRUMP derangement syndrome can cause democraps, and the main stream media, to support our enemies.";

(d) A repost from another individual, which appears to be a "screen grab" from a Fox News segment, which states, at the top, "MAN AND WOMAN," and which then states: "A man goes home and masturbates his typical fantasy. A woman on her knees, a woman tied up, a woman abused. A woman enjoys intercourse with her man—she fantasizes being raped by 3 men simultaneously. . ." The "screen grab" attributes this quote to Bernie Sanders, currently a United States Senator from Vermont, sometime in the 1970's (the exhibit copy is unclear), and Mr. Caggiano's handwritten notes next to this exhibit states: "Bernie said this!";

(e) A repost from a Facebook entity called "Maine Bikers," which states: "Meanwhile at the 'Bikers for Bernie' rally. . .[,]" and which contains a picture of two nude men on a motorcycle;

(f) What appears to be an attempted repost by Mr. Caggiano, which Facebook apparently removed with the message "False information, Checked by independent fact-checkers," but which also contains the following comments from Mr. Caggiano: "Teach this childish nasty bitch a lesson. Have her treasonous ass removed from office and put in jail."; and

(g) A repost, dated August 19, 2020, from Mr. Caggiano, of an article from an entity called "Lifesitenews.com," with a headline that states: "Teen girls stage school walkout to protest boys in their

3

bathroom who claim to be 'girls'"; and to which Mr. Caggiano commented, "Love it! About time people stood up to this insanity."

After a full evidentiary hearing involving sixteen witnesses, including Caggiano, and documentary evidence, the administrative law judge found that only two posts/reposts—items (a) and (d)—warranted further judicial inquiry.[*] The School Board has not claimed it was error for the hearing officer to do so; it filed no exceptions to the administrative law judge's findings and conclusions, nor did it file a cross-appeal claiming error. In short, only the two posts/reposts are at issue in this appellate proceeding.

The administrative law judge concluded that the two "Facebook posts or reposts concern violence and abuse of a child, as well as discriminatory and degrading views of women being abused and raped." On that basis, the administrative law judge concluded that Caggiano violated the teacher code of conduct because he:

- Failed to exercise best professional judgment and integrity. Fla. Admin. Code. R. 6A-10.081(1)(b).
- Failed to maintain the respect and confidence of his colleagues, students, and parents, as well as failed to sustain the highest degree of ethical conduct. Fla. Admin. Code. R. 6A-10.081(1)(c).
- Failed to make reasonable effort to protect students from conditions harmful to learning and/or to the students' mental and/or physical health and/or safety. Fla. Admin. Code. R. 6A-10.081(2)(a)1.
- Intentionally exposed students to unnecessary embarrassment or disparagement. Fla. Admin. Code. R. 6A-10.081(2)(a)5.
- Failed to take reasonable precautions to distinguish between personal views and those of any educational

---

[*] Screenshots of items (a) and (d) are in the Appendix to this opinion.

4

institution or organization with which he is affiliated. Fla. Admin. Code. R. 6A-10.081(2)(b)1.

- Engaged in "immorality," which is "conduct that brings the individual concerned or the education profession into public disgrace or disrespect and impairs the individual's service in the community." Fla. Admin. Code. R. 6A-5.056(1).
- Engaged in conduct that denigrates or shows hostility or aversion toward an individual because of his/her actual or perceived identity with regard to gender. Duval County School Board Policy 10.10(IV)(A).

The administrative law judge concluded that just cause existed for a written reprimand from the School Board and recommended that Caggiano be suspended for three days without pay. The School Board subsequently adopted the administrative law judge's recommendations.

## II.

On appeal, Caggiano argues that his suspension and reprimand violate his free speech rights, a claim the administrative law judge lacked authority to rule upon, but which can be asserted for the first time in a Florida appellate court, provided the record is sufficient to adjudicate the claim. *See Key Haven Associated Enters., Inc. v. Bd. of Trs. of Int. Imp. Tr. Fund*, 427 So. 2d 153, 158 (Fla. 1982) (holding that appellate courts "provide a proper forum to resolve" constitutional challenges to an agency's application of a statute or rule "because those courts have the power to declare the agency action improper and to require any modifications in the administrative decision-making process necessary to render the final agency order constitutional"); *Great House of Wine, Inc. v. Dep't of Bus. & Prof'l Reg.*, 752 So. 2d 728, 729–30 (Fla. 3d DCA 2000) (recognizing "that it is permissible for a district court of appeal to consider constitutional issues in such appeals where the record from the agency is sufficient for complete determination of the issues raised"). The record in this case—consisting of testimony and evidence presented in a four-day evidentiary hearing before the administrative law judge—is more than adequate to allow for judicial review of Caggiano's constitutional claim.

At the outset, it is important to emphasize that the charges against Caggiano involve no use of school resources, no communications or contact with students, and no improper conduct on or with school property; they do not involve false or defamatory statements about the school district, administrators, teachers or students; they do not involve matters of school administration. The swirl of controversy about Caggiano's treatment of a transgender student formed no basis for the charges against him; the School Board chose not to pursue sanctions for the incident, which plays no role in this appellate proceeding. Instead, the disciplinary charges involve only Caggiano's two Facebook posts made from his own personal computer, which were both reposts of third-party content that was derogatory of a candidate in the 2020 Presidential election, Senator Bernie Sanders.

Turning to the law, the contours of teacher free speech are governed by the principles of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny whose framework created a balance between the constitutional rights of a teacher who comments upon matters of public interest as a citizen and the government's interest in the efficient delivery of the public educational services it provides through its teachers, administrators, and staff.

In *Pickering*, a teacher sent a letter that was critical of the school board's operations and budgetary decisions, which was published in the local newspaper. *Id.* at 564. Pickering was fired and a hearing was held, resulting in the board concluding that sufficient evidence existed to support his termination. *Id.* at 566–67. The Illinois state courts concluded that Pickering's letter was "detrimental to the best interests of the schools" and rejected the claim that his dismissal infringed upon his First Amendment rights to speak on a matter of public concern. *Id.* at 567.

In a carefully drawn opinion, the Supreme Court held that the facts presented did not establish a sufficient basis for the school board to dismiss Pickering for his letter. *Id.* at 574. The Court did not establish a definitive standard for evaluating whether a public employee's statement is constitutionally

6

protected, but it did provide guidance in "evaluating the conflicting claims of First Amendment protection and the need for orderly school administration" in the context of a teacher free speech claim. *Id.* at 569. It noted that the "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

The two-part test that has evolved is whether (a) the employee spoke on a matter of public concern (i.e., one of significance or importance in society at large), and, if so, (b) whether the employee's right to free speech outweighs the employer's interest in an efficient workplace without disruption. *Id.*

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citations omitted). This two-part judicial analysis is known as the *Pickering-Connick* test, due to the subsequent case of *Connick v. Myers*, 461 U.S. 138 (1983), in which the Supreme Court further refined the public employee free speech doctrine. *See Garcetti*, 547 U.S. at 418.

Applying the first part of the *Pickering-Connick* test makes obvious that Caggiano's two reposts and his accompanying commentary address a matter of public concern: a Presidential candidate. The Fox News screenshot from the Jesse Watters show depicted a vulgar statement made by Senator Bernie Sanders at a time when he was a college student. The statement was newsworthy because it reflected poorly on the candidate and his judgment. Caggiano's comment that "Bernie said this!" merely expressed his surprise at the statement. Likewise, the repost of the Bernie 2020 T-Shirt schtick is clearly political humor that is derisive of the candidate; its purpose is to commentate in a humorous (to some) manner that Senator Sanders was lacking support, perhaps even within his own ranks. It is hard to imagine, as the School Board did, that this type of attempt at humor was anything more than an innocuous political joke fallen flat.

Because the two reposts involved a matter of public concern, the next question is whether they presented a risk to the School Board's interest in running an efficient workplace that is free of disruption. On this point, no evidence was presented that the two reposts had any meaningful impact on the School Board's operations or that they created any disruption. Indeed, the bulk of the evidentiary focus was on Caggiano's other posts (that were deemed non-actionable) and the uncharged incident involving a transgender student. Next to no evidence exists that anyone had ever seen the two posts, let alone been offended to the point that the school workplace was potentially disrupted in any way. The notion that Caggiano was himself encouraging violence by reposting the Bernie 2020 T-Shirt joke or was degrading women by reposting the Fox News screenshot is wholly insupportable and wildly off-the-mark. At best, the reposts demonstrated that Caggiano disliked Senator Sanders (for his use of sexist language) and was amused by sophomoric humor (that in no way promoted violence). The posts occurred outside of the school, on Caggiano's own time and computer, and amounted to little more than harmless political chitchat; they collectively amounted to the proverbial hill of beans.

Because Caggiano's two reposts involved a matter of public concern, and the School Board entirely failed to show any risk or actual disruption of its operations due to the reposts, the

*Pickering-Connick* balance tips entirely in Caggiano's favor. His suspension, reprimand, and diversity training were insupportable; his free speech rights were violated. Because Caggiano has retired from the school district, it is ordered that the suspension and reprimand be stricken from his employment records and that he be given full pay and related benefits for the time he was suspended.

REVERSED with instructions to strike suspension and reprimand from employment records and to reinstate pay and related benefits from time of suspension.

JAY and SOUD, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

