# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60900

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2015

Lyle W. Cayce
Clerk

SUSAN GRAZIOSI,

Plaintiff – Appellant,

v.

CITY OF GREENVILLE MISSISSIPPI, et al.,

Defendants – Appellees.

Appeal from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, and BENAVIDES, and OWEN, Circuit Judges.

CARL E. STEWART, Chief Judge:

Plaintiff-Appellant Susan Graziosi ("Graziosi") filed suit against Defendants-Appellees Chief Freddie Cannon ("Chief Cannon") and the City of Greenville, Mississippi (collectively, "Greenville") under 42 U.S.C. § 1983, alleging that Greenville terminated her employment for engaging in protected speech, in violation of the First Amendment. Graziosi was dismissed from her position as a sergeant with the City of Greenville, Mississippi Police Department ("GPD") after posting statements critical of her superior officer, Chief Cannon, to the Mayor's public Facebook page. The district court granted summary judgment in favor of Greenville. We AFFIRM.

No. 13-60900

I.

On May 9, 2012, Graziosi, a sergeant with the GPD with over 25 years of service, was notified of her termination after publishing, or "posting," statements critical of Chief Cannon to Facebook. Graziosi's termination came days after she had returned from a suspension for violating multiple sections of the GPD's Policy and Procedure Manual during her response to a domestic disturbance call.

During a meeting before Graziosi's suspension, several officers expressed to Chief Cannon a desire to attend the funeral of a police officer who was killed in the line of duty in Pearl, Mississippi. Despite the city council's decision to disallow the use of patrol cars for personal use under the "take-home" program due to budget concerns, Chief Cannon discussed sending one patrol car to the funeral. However, after learning that one patrol car would not accommodate all of the officers who wanted to attend the funeral, Chief Cannon decided that the officers would have to use their personal vehicles if they planned to attend.

On May 7, 2012, after learning that no member of the GPD attended the funeral, Graziosi used her home computer, while off duty, to post the following statement to her Facebook page:

> I just found out that Greenville Police Department did not send a representative to the funeral of Pearl Police Officer Mike Walter, who was killed in the line of duty on May 1, 2012. This is totally unacceptable. I don't want to hear about the price of gas-officers would have gladly paid for and driven their own vehicles had we known the city was in such dire straights [sic] as to not to be able to afford a trip to Pearll, Ms. [sic], which, by the way, is where our police academy is located. The last I heard was the chief was telling the assistant chief about getting a group of officers to go to the funeral. Dear Mayor, can we please get a leader that understands that a department sends officers of [sic] the funeral of an officer killed in the line of duty? Thank you. Susan Graziosi

Several of Graziosi's Facebook "friends," or followers, "liked," or indicated approval of, her post and left comments. Graziosi posted responses

2

No. 13-60900

to several comments. For instance, when one of her Facebook friends informed her that he had seen a motorcade of police officers heading towards Pearl, Graziosi responded, "you can bet none were from GPD. I'm mad. (can you tell)." In response to a comment lamenting the perceived decline of the GPD by a former officer, Graziosi posted:

> [W]e had something then that we no longer have. . .LEADERS. I don't know that trying for 28 is worth it. In fact, I am amazed everytime [sic] I walk into the door. The thing is the chief was discussing sending officers on Wednesday (after he suspended me but before the meeting was over). If he suddenly decided we "couldn't afford the gas" (how absurd – I would be embarrassed as a chief to make that statement) he should have let us know so we could have gone ourselves. Also, you'll be happy to know that I will no longer use restraint when voicing my opinion on things. Ha!

Later that night, Graziosi posted her initial statement to then-Mayor Chuck Jordan's[1] public Facebook page. Fifteen minutes later, Graziosi made an additional post in which she stated, "If you don't want to lead, can you just get the hell out of the way." Within a minute, she posted again stating, "seriously, if you don't want to lead, just go." One of her fellow officers, Melvin Lee Nettles responded, "Amen Sarge!" Despite this initial demonstration of support, Officer Nettles later chose to recant his statement, making clear that "I support Chief Cannon and the Greenville Police Department. I do NOT support those who don't support MY department."

Upon learning about Graziosi's Facebook posts, Chief Cannon met with the Mayor and the city attorney to discuss his concerns with Graziosi's posts and a course of action for addressing the posts. After these meetings, Chief Cannon decided to initiate an Internal Affairs investigation into Graziosi's statements on Facebook. The investigating officers concluded that Graziosi's actions violated three sections of the GPD's Policy and Procedure Manual:

---

[1] Chuck Jordan is no longer the mayor of Greenville, Mississippi.

Section 2.14 Subsection 3.2, Supporting Fellow Employees;[2] Section 3.7, Insubordination;[3] and Section 3.8 Subsection 2(c), Discipline and Accountability.[4] Greenville notified Graziosi by letter that her employment was terminated due to these violations. She appealed her termination to the city council, which upheld her dismissal.

Graziosi filed suit against Greenville alleging that she was terminated in retaliation for exercising her First Amendment right to engage in free speech. Greenville filed a motion for summary judgment arguing that Graziosi spoke as a public employee on a matter that was not of public concern. Greenville further argued that, even assuming Graziosi spoke as a citizen on a matter of public concern, her claim failed because the department's interest in providing efficient public services coupled with its interest in maintaining harmony and loyalty within the department outweighed Graziosi's interest in expressing her displeasure with Chief Cannon's decision not to send officers to a funeral. Finally, Greenville argued that assuming Graziosi had a successful claim, Chief Cannon was entitled to qualified immunity. Graziosi filed a partial motion for summary judgment arguing that she spoke as a citizen on a matter of public concern and that her interests outweighed Greenville's

---

[2] Subsection 3.2 provides that "[e]mployees will cooperate, support, and assist each other at every opportunity. Employees will not maliciously criticize the work or the manner of performance of another. It is the duty of every officer and employee to refrain from originating or circulating any malicious gossip to the intended detriment of the department or any member thereof."

[3] Section 3.7 explains that "[i]nsubordination will not be tolerated and is subject to disciplinary action up to, and including, dismissal." It defines insubordination as "[a]ny act of defiance, disobedience, dissension or resistance to authority."

[4] Subsection 2(c) allows for "[t]ermination without fault, for such reasons as . . . [c]hronic complaining about operations to the extent that supervisors must spend excessive time dealing with problems or issues caused by complaints."

No. 13-60900

interests because Greenville had failed to demonstrate that her posts caused actual disruption within the GPD.

After considering both motions, the district court agreed with Greenville, granted its motion for summary judgment, and entered judgment in its favor. Specifically, the district court found that Graziosi spoke as a police officer because she identified herself as a member of the GPD by using words such as "we" and "our." The district court further found that Graziosi did not speak on a matter of public concern because the content of her speech did not address public safety or a breach of the public trust, but rather, an internal decision of the department. Finally, the district court found that even assuming that Graziosi spoke as a citizen on a matter of public concern, there was evidence that Graziosi's post caused actual disruption within the GPD, and therefore, Greenville's interests in maintaining discipline and good working relationships within the department outweighed Graziosi's interest in speaking as a citizen on a matter of public concern. Finally, the district court found that even if Chief Cannon had violated Graziosi's First Amendment rights, he was entitled to qualified immunity.[5]

Graziosi now brings this timely appeal of the district court's judgment in which she argues that: (1) she spoke as a citizen rather than as a public employee; (2) she spoke on a matter of public concern to the community; and (3) her interest in speaking on a matter of public concern outweigh those of Greenville in maintaining efficiency.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standards as the district court." *Antoine v. First Student,*

---

[5] Whether the district court properly found that Chief Cannon was entitled to qualified immunity is not an issue on appeal. Therefore, we do not address this finding of the district court.

5

No. 13-60900

*Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (citation omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

This court reviews a district court's conclusions concerning First Amendment issues de novo. *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005). This de novo review includes "the district court's *Pickering* balancing analysis," so long as there are no disputed, material facts. *Id.*

## III.

The Supreme Court has unequivocally rejected the notion that public employees forfeit their right to freedom of speech by virtue of their public employment. *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968). However, the Court has also recognized that the State has an interest in regulating the speech of its employees. *Id.* When presented with these competing interests, courts are directed to "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

To determine whether the public employee's speech is entitled to protection, courts must engage in a two-step inquiry. *See Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014). The first step requires determining whether the employee spoke as a citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the employee has spoken as a citizen on a matter of public concern, then a First Amendment claim may arise. *Id.* The second

No. 13-60900

step of the inquiry requires determining "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*; *see also Lane*, 134 S. Ct. at 2380.[6]

A.

For an employee's speech to be entitled to First Amendment protection, she must be speaking as a citizen on a matter of public concern. *See Garcetti*, 547 U.S. at 418; *see also Hurst v. Lee Cnty., Miss.*, __ F.3d __ , No. 13-60540, 2014 WL 4109647, at *2 (5th Cir. Aug. 21, 2014). Whether a statement is made as an employee or as a citizen is a question of law. *Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008). Furthermore, whether a statement addresses a matter of public concern is a question of law that must be resolved by the court. *Salge*, 411 F.3d at 184.

1.

Graziosi's first argument on appeal is that the district court erred in finding that she spoke as a public employee rather than as a citizen. We agree.

When a public employee speaks pursuant to her official duties, she does not speak as a citizen and her statements are not entitled to constitutional protection. *Garcetti*, 547 U.S. at 421. As this court has acknowledged, "*Garcetti* did not explicate what it means to speak 'pursuant to' one's 'official duties.'" *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (per curiam) (citation omitted).

Recently, the Supreme Court has provided direction to aid courts in determining whether speech is made as a citizen rather than as a public

---

[6] To succeed on a First Amendment retaliation claim, a plaintiff must also demonstrate that the employer took an adverse employment action and that the employee's speech motivated the employer's conduct. *See Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011). Those elements are not at issue here, and therefore, we do not address them.

employee. *See Lane*, 134 S. Ct. at 2379. [7]  In *Lane*, the Court held that a public employee who provided truthful sworn testimony spoke as a citizen.  *Id.* at 2380.  There, it was undisputed that providing sworn testimony was outside of the public employee's ordinary job responsibilities.  *Id.* at 2378 n.4.  Nevertheless, the Eleventh Circuit held that the public employee's speech was made pursuant to his official job duties.  *Id.* at 2379.  The appeals court reasoned that under *Garcetti*, because the information was learned during the course of employment, the speech was that of an employee and not of a citizen. *Id.*  The Supreme Court rejected this broad reading of *Garcetti* and made clear that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

Here, as in *Lane*, it is undisputed that making public statements was not ordinarily within the scope of Graziosi's employment.  Nonetheless, Greenville argues on appeal, and the district court found, that Graziosi spoke as a public employee because she invoked her status as a police officer by using words such as "we" and "our" to identify herself as a police officer.  However, identifying oneself as a public employee does not forfeit one's ability to claim First Amendment protections.  *See Pickering*, 391 U.S. at 574, 576 (affording First Amendment protections to a public employee's statements in a letter to the editor despite the public employee identifying himself as a "teach[er] at the high school").  To the contrary, such identification by public employees is welcome as they "occupy trusted positions in society," *Garcetti*, 547 U.S. at 419,

[7] We have had recent occasion to conduct the *Garcetti* analysis in light of *Lane*.  *See Gibson v. Kilpatrick*, __ F.3d __, 2014 WL 6997642, at *4 (5th Cir. Dec. 11, 2014).  Despite recognizing that aspects of *Lane* "appear to offer the prospect of new law," we ultimately determined that, "*Lane* does not appear to have altered the standard for whether public employees speak pursuant to their official duties, but appears rather to be an application of *Garcetti*'s rule." *Id.*

No. 13-60900

and are "the members of a community most likely to have informed and definite opinions" on matters of import to the community. *Pickering*, 391 U.S. at 572. Because it is undisputed that making these statements was not within the ordinary scope of Graziosi's duties as a police officer, we hold that her statements on Facebook were speech made as a citizen. *See Lane*, 134 S. Ct. at 2378.

2.

We now turn our attention to whether Graziosi spoke on a matter of public concern.[8] Greenville argues on appeal, and the district court found, that Graziosi's speech did not address a matter of public concern, but instead, involved a dispute over an intra-departmental decision. We agree.

Speech involves a matter of public concern if it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983); *see also Lane*, 134 S. Ct. 2380. To determine whether the speech addresses a matter of public concern, we must evaluate the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

First, the content of Graziosi's speech weighs against finding that she spoke on a matter of public concern. It is well established that speech exposing or otherwise addressing malfeasance, corruption or breach of the public trust, especially within a police department, touches upon matters of public concern. *See Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001) ("Exposure of official misconduct, especially within the police department, is generally of

---

[8] As an initial matter, Greenville argues that by failing to adequately address the public concern inquiry, Graziosi has waived any argument that her statements involved a matter of public concern. We disagree. Though her arguments are not well organized, Graziosi has sufficiently briefed this issue by asserting her "contentions and the reasons for them, with citations to the authorities and parts of the record" to forestall waiver. Fed. R. App. P. 28(a)(8)(A).

great consequence to the public."); *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." (footnotes omitted)).  However, exposing malfeasance within the GPD was not the nature of Graziosi's speech.  To the contrary, as in *Connick*, Graziosi's statements "convey[ed] no information at all other than the fact that a single employee [was] upset with the status quo." 461 U.S. at 148; *but cf. Salge*, 411 F.3d at 187 ("[i]f releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." (quotations and footnote omitted)).  Indeed, her statements did not reveal that Chief Cannon was not faithfully discharging his duties nor that the city leaders were mismanaging funds, thus causing the budgetary issues that she contends were the focal point of her posts. *See Connick*, 461 U.S. at 148. (suggesting that exposing a public official's failure to discharge governmental responsibilities or breach of the public trust were matters of public concern).

While we recognize that her posts started by addressing subjects that can be "fairly considered as relating to any matter of political, social, or other concern to the community," *Connick*, 461 U.S. at 146, her posts quickly devolved into a rant attacking Chief Cannon's leadership and culminating with the demand that he "get the hell out of the way."  Graziosi's concession that her displeasure with Chief Cannon's decision prompted her to make the Facebook posts underscores our characterization of her statements as a rant. Therefore, the speech at issue here is akin to an internal grievance, the content of which is not entitled to First Amendment protection. *See Connick*, 461 U.S. at 149 ("While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does

not require a public office to be run as a roundtable for employee complaints over internal office affairs."); *see also Salge*, 411 F.3d at 187 (reiterating that speech is not a matter of public concern when it is made solely in furtherance of a personal employer-employee dispute); *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362–63 (5th Cir. 1986) (holding that statements criticizing the chief of police were not entitled to First Amendment protection because they addressed a "wholly intragovernmental concern.").

Second, the form, a public post on the mayor's Facebook page, weighs in favor of finding that Graziosi spoke on a matter of public concern. The Mayor's Facebook page served as a community bulletin board upon which members of the Greenville community could lobby the Mayor to take a particular action or apprise members of the community of events occurring in town or things of general interest.[9]    Therefore, the form of Graziosi's posts on a medium accessible by the community was primarily public. *Compare Modica v. Taylor*, 465 F.3d 174, 181 (5th Cir. 2006) (concluding that a letter communicated to a state representative outside of the public employer's organization was public), *with Terrell*, 792 F.2d at 1362–63 ("Terrell's personal notebook cannot serve as the basis for a claim that he was fired for exercising his first amendment rights. He made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have had any occasion to do so.").

Finally, the context weighs against a finding that she spoke on a matter of public concern. Graziosi made the posts immediately after returning to work

---

[9] Examples in the record of posts made by members of the Greenville community to the Mayor's Facebook page include: "Please send a letter to Bill Gatlin at the Mississippi Department of Archives and History in SUPPORT of the proposed downtown Greenville historic district by September 20."; "I would like to invite you out to the Shabbach Magazine Cover Pageant on tomorrow. . . .Come out and enjoy great family fun."; and "Greenville is featured in the New York Times!"

from an unrelated suspension. Furthermore, when making the posts, she admits that she was angry with Chief Cannon for his decision not to send a representative to the funeral of a fallen police officer and concedes that she was "hot-headed" and that her posts were "inappropriately intense." Moreover, she admits that her anger and dissatisfaction with Chief Cannon's decision motivated her to make these statements. Therefore, Graziosi's speech was made within the context of a private employee-employer dispute, which militates against a finding that her speech was public in nature. *See Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999) (concluding that speech made within the context of an employee-employer dispute weighed heavily against a finding that the speech was of the public's concern).

Weighing the content, form, and context of Graziosi's speech together, we hold that the speech is not entitled to First Amendment protection. Despite the perhaps genuine desire to inform the community about the GPD's failure to send a representative to the funeral of a police officer killed in the line of duty, we cannot allow the "mere insertion of a scintilla of speech regarding a matter of public concern," *id.* at 382, to "plant the seed of a constitutional case." *Connick*, 461 U.S. at 149. Graziosi's statements were primarily motivated by and primarily addressed her displeasure with Chief Cannon for his perceived lack of leadership concerning an intra-departmental decision and thus, the district court correctly dismissed her claim. *See Teague*, 179 F.3d at 382–83 (concluding that the district court properly dismissed claims primarily motivated by and primarily addressing personal grievances).

B.

Even proceeding under the assumption, as did the district court, that Graziosi spoke as a citizen on a matter of public concern, she nevertheless fails to demonstrate that her interests outweigh those of Greenville. In coming to this conclusion, we must determine "whether the relevant government entity

No. 13-60900

had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. To do this, we must strike a balance between "the interests of [Graziosi], as a citizen, in commenting upon matters of public concern and the interest of [Greenville], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

When performing this balancing test, courts consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary[.]" *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Where, as here, a case involves weighing the interests of a police department, preserving loyalty and close working relationships within the department are important considerations. *See Kinney v. Weaver*, 367 F.3d 337, 366 (5th Cir. 2004) (en banc). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. Because "police departments function as paramilitary organizations charged with maintaining public safety and order, they are given *more* latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007) (emphasis added) (internal quotations and citation omitted).

Here, Greenville contends that it justifiably dismissed Graziosi to prevent insubordination within the department. We agree. Through her statements, Graziosi publicly criticized the decision of her superior officer and requested new leadership. Furthermore, she told leadership to "get the hell out of the way," underscoring that demand by stating, "seriously, if you don't want to lead, just go." Finally, Graziosi vowed to "no longer use restraint when voicing [her] opinions." These statements coupled with her vow of future and

13

continued unrestrained conduct "smack of insubordination," and Greenville was well within its wide degree of latitude to determine that dismissal was appropriate. *See Nixon*, 511 F.3d at 499 (concluding that the police department justifiably dismissed an officer who knowingly disobeyed orders and made statements that suggested future insubordination). Accordingly, Greenville has articulated a substantial interest in maintaining discipline and close working relationships and preventing insubordination.

In response to Greenville's articulated interest, Graziosi contends that Greenville has failed to prove that the content of her Facebook posts were inherently disruptive to, or actually disruptive of, the efficient operations of the police department. Instead, she argues that the only effect that her Facebook statements had was to make Chief Cannon upset due to her public criticism of his decision.[10] We disagree. First, Greenville has presented evidence that Graziosi's comments were actually disruptive of its operations. Officer Nettles testified that he was prompted to recant his initial support for Graziosi's statements due to a "buzz around the department" among several patrolmen. Moreover, Chief Cannon testified that he noticed a change in the demeanor towards him by two of his officers.

Second, contrary to Grazisosi's reading of *Connick*, it does not stand for the proposition that Greenville is required to prove actual disruption. Instead, it supports Greenville's position that it was justified in terminating Graziosi to prevent *future* disruption. In *Connick*, the statements at issue therein caused what the employer characterized as a "mini-insurrection," thus establishing actual disruption. *Connick*, 461 U.S. at 151. Nevertheless, the Court took the

---

[10] Graziosi fails to point to any evidence in the record to support Chief Cannon's subjective beliefs. However, even if she did point to such evidence, Chief Cannon's subjective state of mind is immaterial in light of the evidence discussed *infra* supporting Greenville's decision to terminate Graziosi's employment.

No. 13-60900

opportunity to explain that it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 152. Therefore, even if, as Graziosi contends, office buzz was not evidence of actual disruption, Greenville did not need to wait for departmental buzz to become a "mini-insurrection" before it terminated Graziosi's employment. Instead, as our court has recognized, "courts have consistently given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Nixon*, 511 F.3d at 499 n.8 (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994)); *see also id.* (rejecting officer's argument that police department was required to prove actual disruption). In light of the buzz around the department and Graziosi's promise of future unrestrained conduct, Greenville based its decision to dismiss Graziosi on a reasonable prediction of future disruption.

We hold that Greenville's substantial interests in maintaining discipline and close working relationships and preventing insubordination within the department outweigh Graziosi's minimal interest in speaking on a matter of public concern. We do so in light of the wide latitude afforded police departments as paramilitary operations to discipline and otherwise regulate its employees. *See Nixon*, 511 F.3d at 501.

## IV.

For the reasons stated herein, the judgment of the district court is AFFIRMED.