# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 23-60072

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

July 23, 2024

Lyle W. Cayce
Clerk

Frederick Lewis Washington,

*Plaintiff—Appellant*,

*versus*

Sunflower County, Mississippi,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:22-CV-54

———————————————————————

Before King, Jones, and Oldham, *Circuit Judges*.

Per Curiam:[*]

The Sunflower County Board of Supervisors fired County Administrator Frederick Lewis Washington. Washington sued under federal and state law, alleging that he was wrongfully discharged for disclosing a bid-rigging scheme. The district court entered judgment for the County. We affirm.

———————————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-60072

I.

This case arises from a motion for judgment on the pleadings, so we "accept the well-pleaded facts as true." *Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co.*, 29 F.4th 252, 256 (5th Cir. 2022).

Frederick Lewis Washington served as County Administrator for Sunflower County, Mississippi until September 20, 2021. As County Administrator, Washington's duties generally "concern[ed] administrative duties of carrying out the policies and directions of the Board of Supervisors in performing such tasks as making estimates of expenditures for the annual budget, hiring, directing and controlling the work of County employees, and managing administrative and accounting functions." ROA.6. And Washington's complaint specifies that his "duties are described in Miss. Code Ann. § 19-4-1 and Miss. Code Ann. § 19-4-7." *Ibid.* Those statutes provide, in relevant part:

> Such administrator, under the policies determined by the board of supervisors and subject to said board's general supervision and control, shall administer all county affairs falling under the control of the board and carry out the general policies of the board in conformity with the estimates of expenditures fixed in the annual budget as finally adopted by the board or as thereafter revised by appropriate action of the board.

Miss. Code Ann. § 19-4-1. And:

> The board of supervisors may delegate and assign to the county administrator [the following duties]:
>
> . . .
>
> (m) See that all orders, resolutions and regulations of the board of supervisors are faithfully executed;

2

> (n) Make reports to the board from time to time concerning the affairs of the county and keep the board fully advised as to the financial condition of the county and future financial needs;
>
> (o) Keep the board of supervisors informed as to federal and state laws and regulations which affect the board of supervisors and the county . . . .

*Id.* § 19-4-7.

On or about September 17, 2021, Washington learned members of the Board of Supervisors had engaged in what Washington believed to be an illegal bid-rigging scheme. Washington "informed the Chancery Clerk (the Clerk of the Board of Supervisors) that the Board had made an illegal purchase of a garbage truck." ROA.6. In doing so, he "reported to the Board" the potential legal problems with their own actions. *Ibid.* At the next Board meeting, the Board "went into executive session . . . and discharged [Washington] from his employment." ROA.8.

In November 2021, Washington filed a Notice of Claim before the Board, seeking re-employment and damages for his purportedly unlawful termination. Washington then filed this action in district court, alleging violations of the First Amendment and Mississippi law. Sunflower County moved for judgment on the pleadings under Rule 12(c). The district court granted that motion as to Washington's First Amendment claim. It denied the motion as to the state law claim, instead declining to exercise supplementary jurisdiction under 28 U.S.C. § 1367(c) and dismissing the state claim without prejudice.

## II.

We review a district court's ruling on a Rule 12(c) motion for judgment on the pleadings *de novo*, applying the same standard used for deciding Rule 12(b)(6) motions to dismiss. *In re Katrina Canal Breaches Litig.*,

495 F.3d 191, 205 (5th Cir. 2007). We therefore "accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Q Clothier*, 29 F.4th at 256. Like under Rule 12(b)(6), to survive the Rule 12(c) stage, a complaint must plead "sufficient factual matter . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But we need not accept the complaint's legal conclusions or "mere conclusory statements." *Ibid.*

Local governments, including counties, are amenable to suit under 42 U.S.C. § 1983 for policies that violate the Constitution. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978). To state a § 1983 claim against Sunflower County, Washington must show (1) a constitutional violation (2) for which the "moving force" was (3) an official policy or "governmental custom." *Id.* at 690–91, 694 (quotation omitted). It is well settled that "without a predicate constitutional violation, there can be no *Monell* liability." *Loftin v. City of Prentiss*, 33 F.4th 774, 783 (5th Cir. 2022) (citing *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020)).

The predicate constitutional violation alleged in this case is a violation of the public employee speech doctrine. "To determine whether the public employee's speech is entitled to protection, courts must engage in a two-step inquiry." *Graziosi v. City of Greenville*, 775 F.3d 731, 736 (5th Cir. 2015) (citing *Lane v. Franks*, 573 U.S. 228, 237 (2014)); *see also Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020) (same); *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014) (same). First, courts determine whether the plaintiff "spoke as a citizen on a matter of public concern." *Gibson*, 773 F.3d at 666. If the answer is no, that ends the inquiry. *Powers*, 951 F.3d at 307. If the answer is yes, the court will also consider the justification for the adverse employment action "by balancing the interest in allowing the speech against the interest in penalizing it." *Gibson*, 773 F.3d at 666–67.

No. 23-60072

As to the first step, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). To determine whether speech is "pursuant to [an employee's] official duties," we engage in a "practical" inquiry, *id.* at 421, 424, asking whether the speech was "ordinarily within the scope of [the] employee's duties." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022) (quoting *Lane*, 573 U.S. at 240).

Two cases merit discussion to explain the contours of the public employee speech doctrine. First, the Supreme Court's holding in *Kennedy* demonstrates when speech is not within a public employee's ordinary job responsibilities. *See id.* at 529–30. In *Kennedy*, the plaintiff, a football coach, engaged in brief, personal prayers at midfield after football games. 597 U.S. at 518–19 (describing the activity that ultimately led to the adverse employment action). The Supreme Court held those prayers were not "ordinarily within the scope of his duties as a coach" because the speech reflected no government policy, was not conveying a government message, was not directed at the players he was paid to coach, and took place during a time when other faculty members engaged in other private conduct. *Id.* at 513, 529–31. Only by crediting "an 'excessively broad job description'" could the Court have found the coach's speech was made pursuant to his ordinary duties. *Id.* at 530–31 (alteration adopted) (quoting *Garcetti*, 547 U.S. at 424). The Supreme Court declined to read the coach's job description in that way, and so found the coach spoke as a citizen, not a public employee. *Id.* at 531.

Second, our court's decision in *Powers* clarifies when speech *is* within the scope of an employee's ordinary job duties. There, a principal and assistant principal of an elementary school made a series of calls to the Texas Education Agency to "validate that [they] were on the right approach for

[testing] accommodations" and to report that the school district had "violated the law" by backtracking on that approach. *Powers*, 951 F.3d at 303 (quotations omitted). Although the plaintiffs admitted their "job duties included implementing [the testing accommodations] for students," they nonetheless "contend[ed] that their job duties did not include *reporting* [the district's] alleged misconduct to a higher level authority." *Id.* at 308 (emphasis in original). But the plaintiffs served on "the school's committee that was tasked with implementing and ensuring compliance" with the accommodations and "participated in . . . meeting[s]" to determine student eligibility for the accommodations. *Ibid.* Our court found, given the scope of the plaintiffs' ordinary duties, that reporting the alleged misconduct was speech "in the course of performing . . . Plaintiffs' official duties" and therefore unprotected. *Ibid.* (quotation omitted).

Here, Washington's complaint belies any contention that his speech was outside the scope of his ordinary job duties. As noted above, Washington pleads his job description as outlined in two provisions of the Mississippi Code. ROA.6 (citing Miss. Code Ann. §§ 19-4-1 & 7). Those provisions include duties like "carry[ing] out the general policies of the board," Miss. Code Ann. § 19-4-1, executing all "orders, resolutions and regulations of the board," *id.* § 19-4-7(m), "[m]ak[ing] reports to the board . . . concerning the affairs of the county," *id.* § 19-4-7(n), and "[k]eep[ing] the board of supervisors informed as to federal and state laws and regulations which affect the board of supervisors and the county," *id.* § 19-4-7(o). Thus, reporting potentially illegal misconduct to the Board's own clerk was clearly "in the course of" Washington's job duties.

Even if we ignored Washington's formal job description, his own words establish a similar scope for his duties. He pleads his "duties concern[ed] administrative duties of carrying out the policies and directions of the Board of Supervisors . . . ." ROA.6. Reporting a potentially illegal

6

decision to the Board's clerk is clearly within the scope of "carrying out the . . . directions of the Board," even if it was an unusual circumstance. In the same way that reporting misconduct was "in the course of" implementing the school program in *Powers*, 951 F.3d at 308, reporting bid-rigging was "in the course of" conducting the County's administrative business.

And unlike *Kennedy*, Washington pleads no facts that could raise a plausible inference that his report was outside his ordinary job duties. His speech was related to the County business he oversaw. He reported directly to the Chancery Clerk, who served as the Board's clerk. And although the speech possibly undermined the Board's interests, his speech was still government-directed, as reporting on state law affairs fell within his job description. Washington's complaint therefore offers none of the markers of private speech the Supreme Court emphasized in *Kennedy*. *See* 597 U.S. at 529–30.

Finally, Washington's argument that "talking to the elected chancery clerk [was not] a part of the job duties of the County Administrator" is also unavailing. Blue Br. at 9. His own complaint suggests reporting to the Clerk amounted to reporting to the Board. The report was therefore analogous to the reports in *Powers*. And Washington points to no precedent that would undermine that conclusion. *See Graziosi*, 775 F.3d at 737 (finding a police officer spoke as a citizen in Facebook posts because "making public statements was not ordinarily within the scope of Graziosi's employment"); *Bevill v. Fletcher*, 26 F.4th 270, 276–78 (5th Cir. 2022) (finding a police officer's affidavit supporting venue transfer was not "pursuant to an official duty" because the affidavit was submitted as a friend of the defendant and Bevill "did not speak for QPD's benefit when he submitted [the] affidavit"); *Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016) (finding a police officer spoke as a citizen in cooperating with an FBI investigation).

No. 23-60072

Washington therefore fails to raise a plausible inference that he spoke as a private citizen. Without that showing, he cannot support a First Amendment claim against Sunflower County, and we need not reach the other elements of his claim.

## III.

The district court declined to exercise supplemental jurisdiction over Washington's state law claim. *See* 28 U.S.C. § 1367(c). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). We therefore review for abuse of discretion. *Id.* at 640; *see also Hicks v. Austin Indep. Sch. Dist.*, 564 F. App'x 747, 748 (5th Cir. 2014) (per curiam). In this case, Washington brought one federal claim over which the district court had original jurisdiction. After the district court dismissed that federal claim, it had discretion under § 1367(c) to decline supplemental jurisdiction over the state law claim. Washington points to nothing to suggest the district court abused that discretion.

AFFIRMED.

8