# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00471-COA

**ANGELA A. AVERY**                                                              **APPELLANT**

**v.**

**THE UNIVERSITY OF MISSISSIPPI**                                      **APPELLEE**

DATE OF JUDGMENT:            03/31/2021
TRIAL JUDGE:                 HON. JAMES McCLURE III
COURT FROM WHICH APPEALED:   LAFAYETTE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      GOODLOE TANKERSLEY LEWIS
ATTORNEYS FOR APPELLEE:      J. CAL MAYO JR.
                             SARAH KATHERINE EMBRY
NATURE OF THE CASE:          CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                 AFFIRMED - 08/23/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Angela Avery was terminated from her job at the University of Mississippi (University) as an Annual Giving team member in the Development Office. The University Personnel Action Review Board (PARB) upheld her termination, and the Chancellor of the University agreed, denying her appeal. Avery filed a petition for writ of certiorari in the Lafayette County Circuit Court, which dismissed her petition for lack of jurisdiction.[1] Upon

---

[1] The circuit court dismissed the petition because Avery failed to post a bond with security within six months of the University's termination decision. This Court found extenuating circumstances hindered Avery's ability to post bond, reversing and remanding the dismissal in *Avery v. University of Mississippi* (*Avery I*), 309 So. 3d 466, 467 (¶2) (Miss. Ct. App. 2019).

this Court's remand, the circuit court accepted the petition, and the parties briefed the issues. The circuit court affirmed the PARB's decision, and Avery again appealed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On February 2, 2017, the University terminated Avery's employment. For fifteen years, the University Development Office and the University Foundation employed Avery in various capacities related to fund-raising.[2] From 2011 through 2013, Avery worked for the Foundation as a "prospect research analyst" and claimed she was harassed by her supervisor, Lauren Beyers. At that time, Avery and Beyers discussed their conflicts with management and with the University's Human Resources Department, but no formal action was taken. In 2014, in an attempt to separate Avery and Beyers, Avery was moved to the "Annual Giving" team in the Development Office. One of Avery's primary duties was to create and manage the University's online crowd-funding platform called Ignite Ole Miss. Through Ignite Ole Miss's campaigns, she successfully raised over $2.5 million for the University. Avery got along well with her new supervisor, Suzanne Thigpen, who was director of Annual Giving; however, Thigpen left the position in 2016. In July 2016, Dr. Robin Buchannon, Associate Vice Chancellor for University Relations, took on supervisory authority over Avery and the Annual Giving team. Avery claimed the harassment resumed.

___

[2] The Development Office and the Foundation are two separate entities. The former is a department of the University, and the latter is a private entity. Both constitute the academic fundraising part of the University and work closely together.

At this time, Avery was a part-time, salaried employee.

¶3. Buchannon testified that through the fall of 2016, she was getting "frustrated" with the Annual Giving team's "fussing at each other." Buchannon met with a human resources manager who told her there had been a history of problems in the department, including unprofessional behavior and work absences. Buchannon also learned Avery did not get along with Beyers, who was now the prospect research manager in the Development Office. Additionally, Buchannon complained that Avery had been working irregular hours off-campus. Buchannon wanted Avery to start working regular hours on-campus, which Avery began doing in October 2016. Avery also chose to start working full-time instead of part-time.

¶4. The Annual Giving team continued to have a toxic work environment. In November 2016, the University undertook "Progressive Discipline" against the entire team for what Avery described as personality conflicts among members and what the University described as a pattern of unprofessional behavior. The University's "Progressive Discipline Policy" provided the following steps: verbal notice, formal warning, and dismissal as a last resort. On November 10, 2016, Buchannon provided Avery with a letter that summarized a two-hour meeting of the Annual Giving team on November 1, 2016. Those members present at the meeting included Buchannon, Avery, Human Resources manager Andrea Jekobsons, and fellow Annual Giving team members Raina McClure and Maura Wakefield. The purpose of the meeting was "to have a frank and open discussion regarding the disrespectful

3

environment and conflicts that have plagued Annual Giving for the past several months. . . ." Matters addressed were "inappropriate team member interactions," "disrespectful non-verbal communications," "disrespectful gossip," and "confrontational behavior between team members." During the meeting, Wakefield stated that she felt disrespected and excluded by Avery and McClure. Avery admitted to engaging in some of the disrespectful behavior. "The meeting resulted in an airing of grievances," and the entire team was instructed to "focus on being professional in interactions around the office, including treating each other with respect, dignity, and civility." Buchannon's letter concluded by stating that "[t]he consequences of not meeting the expectations set forth in the meeting . . . will be grounds for progressive discipline, including possible discharge." The November 1 meeting constituted the first step of progressive discipline ("verbal notice" by Avery's supervisor), and the November 10 letter gave Avery written notice.

¶5. On December 1, 2016, Avery met with Buchannon to discuss a November 14, 2016 Annual Giving meeting attended by Avery, Wakefield, McClure, and Faith Bachus, who was the operations manager of the Development Office. (Wakefield had reported more unprofessional conduct that Avery had directed at her at the December 1 meeting.) Buchannon consulted with Human Resources, which investigated the report and interviewed Bachus, who was believed to be objective and neutral. Bachus described Avery's conduct toward Wakefield as aggressive, defensive, dismissive, and very demeaning. As a result, Buchannon signed and Avery received a "formal warning," the second step of progressive

4

discipline.

¶6.     Avery contends that further conflict arose in January 2017 when the University began searching for a new director of Annual Giving. Avery, who had signed a confidentiality agreement but was not a member of the search committee, claimed that certain members of the committee, particularly Beyers and Buchannon, had "gross conflicts of interest" with a candidate who made it to the final round of interviews, while other more qualified candidates were rejected. Specifically, Avery claimed Beyers, Buchannon, and another committee member had a close personal relationship with this candidate. Ultimately, however, this candidate was not hired. Avery discussed this matter (after hours) with individuals from the Development Office and the Foundation and secretly recorded the discussion. Avery claims her supervisor, Buchannon, was made aware of the conversation.

¶7.     On February 1, 2017, Beyers emailed Buchannon about her concern that Avery had asked certain individuals to assign appeal codes to numerous annual-fund gifts that lacked a specific appeal code.[3] Beyers expressed ethical concern about these actions and noted the integrity of the data and related decisions. Buchannon became frustrated that Avery had not been instructed to embark on this project and never expressed any prior concern about the lack of appeal codes on certain gifts.

¶8.     Later that day, Buchannon and two other vice chancellors met with Avery, giving her

---

[3] Avery explains that appeal codes are assigned to monetary gifts that come to the Foundation. The codes relate to a specific appeal for funds. Gifts lacking appeal codes totaled about $20,000.

the choice to resign or have her employment terminated.[4]  Her dismissal would constitute

the third step in the Progressive Discipline Policy.  They instructed Avery to let them know

her choice in twenty-four hours.  When Avery did not respond, the University terminated

her employment on February 2, 2017.  Avery requested a written explanation of reasons for

the termination.[5]  In response, on February 23, 2017, Avery received a formal letter from

Buchannon stating the reasons:  she failed "to improve [her] job performance after repeated

counseling and after verbal and written warnings," which were documented in the

November 10 and December 1, 2016 letters to her, and "[p]revious supervisors had

---

[4] Buchannon's "talking points" from the meeting referred to the November 10 meeting of the Annual Giving team when Avery was told to refrain from inappropriate interactions, disrespectful gossip, and confrontational behavior with the team members and in the office.  Two weeks later, on December 1, Buchannon noted Avery was cited again for continued engagement in inappropriate actions and bullying tactics toward her team members.  Avery was warned that "any further disrespectful acts towards any member of the office" would result in immediate dismissal.  Two months later, Buchannon pointed out continued incidents of "engaging others in inappropriate conversations."  As an example, Buchannon was made aware that Avery "tried to engage other people to talk about the search for a director of Annual Giving, breaking the confidentiality agreement" Avery had signed.

[5] On February 8, 2017, Avery emailed a detailed letter to Jeffrey Vitter, the then-chancellor of the University, and other members of leadership in accordance with the University's code of ethics and whistleblower protection policies.  Avery expressed concern about the conflicts of interest within the search committee and her "unfair treatment" by the Development Office.  Avery claimed her "threatened termination" was an attempt to cover up and conceal her knowledge of the gross conflicts of interest within the search committee, effectively preventing her from becoming a whistleblower.  However, Avery already had been terminated at the time of this letter.  Avery also claimed she was unfairly denied membership on the search committee while others were granted membership in violation of the code of conduct and ethics.  She concluded that "the Office of Development has long been plagued by a leadership that has created an atmosphere of distrust . . . where employees are either inside . . . the 'inner circle' or are isolated."

6

difficulty working with [Avery]." Finally, the letter noted the "ethical concerns" about Avery's "ask[ing] others to assign appeal codes to several gifts that had been attributed to the Ole Miss Fund at the time of receipt," which "would primarily benefit [Avery's] Ignite numbers. . . . Altering the appeal codes could adversely impact the integrity of our data and the value of related analysis."

¶9.     Avery requested the PARB review the University's termination decision. In March 2017, the PARB conducted a grievance hearing that lasted over eight hours. A total of twelve witnesses testified. Avery began the hearing by objecting to the University's use of issues older than twelve months as a basis for termination, in violation of a twelve-month limit under the Progressive Discipline Policy, as well as issues presented for the first time after her February 1, 2017 termination, such as the ethical concerns about appeal codes. No ruling was made on her objections. Buchannon testified about issues concerning Avery's work hours and leave requests dating back to 2011 to 2013 and 2016. Buchannon also complained about Avery's "lack of responsiveness" regarding her failure to respond to emails timely or at all, even though no disciplinary action was ever taken on these matters.

¶10.    Avery contends the allegation in the December 1, 2016 formal warning of "failure to focus [on] task assigned" refers to her effort to assign appeal codes to gifts for the University. The University suggested such actions were unethical because Avery was attempting to "manipulate data . . . to incorrectly represent where the appeal came from." Avery denied this contention and presented witnesses who stated that such actions were

common practice in the Annual Giving program and not unethical. Avery maintained this allegation was an invalid basis for termination. Additionally, Avery conceded that she and others received warnings about "treating co-workers with disrespect," but she argues there was no evidence of disrespect after her formal warning on December 1, 2016.

¶11. While not included as a formal reason for her termination, Avery points out the University's witness Brooke Barnes, a Development Office employee, testified about the two-hour conversation in Avery's office in January 2017 that Avery secretly recorded, transcribed, and presented as evidence at the PARB hearing. The University argued that Avery's recording violated a confidentiality agreement she had executed about the search for a new director of Annual Giving. Avery denied this alleged violation.

¶12. The PARB unanimously upheld Avery's dismissal. In May 2017, Avery appealed to Chancellor Jeffrey Vitter, who denied the appeal. He found the original termination decision and the PARB's decision upholding the termination were supported by substantial evidence and were not arbitrary or capricious.

¶13. Avery petitioned the circuit court for certiorari review, making three arguments. First, she claimed the University's failure to provide clear and consistent reasons for her termination and the PARB's hearing format deprived her of due process. Second, she argued that the University's claim about her disrespect to her co-workers was not supported by substantial evidence; thus, her termination was arbitrary and capricious. Third, Avery contended her termination violated her First Amendment right to discuss the search for the

8

director of Annual Giving.

¶14. The circuit court found Avery's arguments without merit and affirmed her termination. The circuit court also agreed with the University that Avery was discharged as an at-will employee and therefore "did not have a protected property interest in her continued employment with the University"; thus, she was not protected by due process. Further, the court found that even if she were entitled to due process, the University afforded her sufficient notice and an opportunity to be heard. The circuit court also found substantial evidence supported her termination because she exhibited disrespectful behavior that caused her final warning. Moreover, the court found that under her professional responsibilities, Avery voluntarily gave up her right to discuss anything about the search for a director by signing the confidentiality agreement; therefore, Avery's First Amendment liberties as a private citizen were not infringed.

## STANDARD OF REVIEW

¶15. "State universities, like other executive branch agencies, have adopted appellate procedures for employees who wish to contest an adverse employment decision and have formed administrative, quasi-judicial tribunals to hear and rule upon employee appeals." *Jones v. Alcorn State Univ.*, 120 So. 3d 448, 451-52 (¶8) (Miss. Ct. App. 2013) (quoting *Smith v. Univ. of Miss.*, 797 So. 2d 956, 960 (¶11) (Miss. 2001)). The University's PARB is one such tribunal, and its "employment decisions may be reviewed by writ of certiorari" under Mississippi Code Annotated section 11-51-95 (Rev. 2019). *Smith*, 797 So. 2d at 959

9

(¶9). "When appeal is taken to the circuit court through writ of certiorari, [Mississippi Code Annotated section] 11-51-93 [(Rev. 1991)] provides that 'the court shall be confined to the examination of questions of law arising or appearing on the face of the record and proceedings. . . .'" *Smith*, 797 So. 2d at 959 (¶10).

¶16.    On appeal before this Court, our standard of review is limited to determining whether the decision "(1) was unsupported by substantial evidence, (2) was arbitrary and capricious, (3) was beyond the power of the [tribunal] to make, or (4) violated some statutory or constitutional right of the complaining party."[6] *Jones*, 120 So. 3d at 452 (¶8) (quoting *Miss. Bureau of Narcotics v. Stacy*, 817 So. 2d 523, 528 (¶17) (Miss. 2002)). Questions of law are reviewed de novo. *T. Jackson Lyons & Assocs. P.A. v. Precious T. Martin Sr. & Assocs. PLLC*, 87 So. 3d 444, 448 (¶10) (Miss. 2012).

**ANALYSIS**

¶17.    Avery raises the following six issues: (1) the University failed to provide findings of fact concerning her termination; (2) Avery was deprived of due process when the University's reasons for her termination presented at the PARB hearing were not stated in its formal termination letter dated February 23, 2017; (3) the University's reasons for Avery's termination are prohibited by its own policy, which provides that matters occurring

_____

[6] The University cites the substantial evidence standard as well as arguing that under the employment at-will doctrine, the PARB decision should not be reviewed under the substantial evidence/arbitrary-and-capricious standard because Avery was not a contract employee and had no statutory right to employment.

one year or more before the progressive discipline begins cannot be a basis for termination, and her termination was based on events occurring in 2012 and 2014; (4) personnel in Human Resources admitted they did not interview all witnesses involved in an incident that was the basis of Avery's termination; (5) Avery was deprived of due process by the University's vague and inconsistent reasons for her termination, reasons not permitted by its own policy, and a hearing that did not allow her to rebut the University's reasons; and (6) the University violated the First Amendment by terminating Avery because she discussed conflicts of interest among committee members in the search for a new director of Annual Giving.

¶18. Avery claims that based upon the above arguments, the PARB's decision was arbitrary and capricious, not supported by substantial evidence, and violated her right to due process; therefore, the University's decision should be vacated and her employment reinstated. The University argues the circuit court lacked subject matter jurisdiction over Avery's petition for writ of certiorari, and Avery's appeal therefore should be dismissed for lack of jurisdiction.

¶19. First, we will consider the preliminary issues of jurisdiction and the PARB's lack of factual findings. Then, we will discuss the alleged violations of due process and the First Amendment.

### I. Jurisdiction

¶20. The University argues that the circuit court lacked subject matter jurisdiction over

Avery's petition for writ of certiorari.[7] The University contends that Avery's appeal to the University's chancellor was her final administrative remedy; further, the chancellor's decision was the University's final decision under its policy for resolution of a non-faculty grievance. It is undisputed that Avery did not petition the circuit court to review the chancellor's decision; instead, she sought review of the earlier PARB decision, with which the University's chancellor agreed. The University concludes that Avery's petition in the circuit court failed to seek certiorari review of the chancellor's decision, as opposed to the PARB's decision, which deprives our Court of jurisdiction.

¶21. It is well established that "a party has no right of appeal, except insofar as it has been given by law." *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 590 (Miss. 1990). The statutory method for seeking review of certain university employment decisions is by writ of certiorari. Two applicable statutes, sections 11-51-93 and -95, control the appeal in this case. Section 11-51-95 provides for the right to obtain review of decisions of "tribunals inferior to the circuit court" which includes the "hearing panels at state universities . . . whose employment decisions may be reviewed by writ of certiorari." *Smith*, 797 So. 2d at 960 (¶12) (citing *Hall v. Bd. of Trs. of State Insts. of Higher Learning*, 712 So.

---

[7] "The State's public universities are considered a part of the executive branch of State government." *Smith v. Univ. of Miss.*, 797 So. 2d 956, 959-60 (¶11) (Miss. 2001) (citing *Van Slyke v. Bd. of Trs. of State Insts. of Higher Learning*, 613 So. 2d 872, 879 (Miss. 1993)). "State universities, like other executive branch agencies, have adopted appellate procedures for employees . . . to contest an adverse employment decision . . . ." *Id.* at 960 (¶11). "The PARB is a quasi-judicial administrative panel that has the authority to review and overturn staff employment decisions." *Id.* at 958 (¶4).

2d 312, 324 (¶44) (Miss. 1998)).

¶22. After this Court remanded *Avery I* (where we reversed the circuit court's grant of the University's motion to dismiss for lack of jurisdiction due to Avery's failure to post a timely bond), the University filed a second motion to dismiss for lack of subject matter jurisdiction in the circuit court, claiming Avery improperly appealed the wrong "inferior tribunal" decision—the PARB's decision and not the chancellor's decision. After a hearing, the circuit court denied the motion to dismiss and considered the merits of Avery's petition for writ of certiorari.

¶23. In *Avery I*, the University raised this same issue. *Avery I*, 309 So. 3d at 474-75 (¶¶33-36). We found the issue was waived because the University did not raise it before the circuit court. *Id.* at 474 (¶34). Waiver notwithstanding, we found the University provided no legal support for this argument. *Id.* We cited *Smith* as instructive, where "the University argued that because the terminated employee did not appeal the PARB's decision to the circuit court within six months, that decision was final." *Id.* (citing *Smith*, 797 So. 2d at 960 (¶14)). In *Smith*, we noted that there was no mention of the chancellor's review in making this determination. *Id.* We also stated that while section 11-51-95 controls and provides for appeals of "tribunals inferior to the circuit court," "[t]here is no indication how the chancellor's decision fits within the statutory framework for an appeal." *Id.* at (¶35). Moreover, as far as the timing of the appeal, our research showed that "[n]o Mississippi cases appear to consider the appeal from the decision of a university chancellor or president

13

rather than from the 'tribunal inferior to the circuit court,' such as the PARB." *Id.* at 475 (¶36).

¶24.    Now, the University claims that this Court "misapprehended" the jurisdictional issue in *Avery I* by finding it has been waived, and that this Court inaccurately suggested "inferior tribunals" must consist of more than one decision-maker (the PARB) instead of the chancellor. We find the University's argument on jurisdiction is not well taken.

¶25.    Subject matter jurisdiction cannot be waived, and if it is lacking, the trial court must dismiss the action. *Bullock v. Roadway Exp. Inc.*, 548 So. 2d 1306, 1308 (Miss. 1989). "Subject matter jurisdiction relates to the power and authority of a court to entertain and proceed with a case." *Id.* However, as we stated in *Avery I*, "the University does not provide any legal support" for its jurisdictional argument that Avery appealed from the wrong tribunal. *Avery I*, 309 So. 3d at 474 (¶34). Additionally, the University argues *Smith*, as cited in *Avery I*, is inapplicable because it occurred "decades ago" (2001), and the University's grievance procedures might have changed since that time. The University, however, provides no proof, only speculation, of this policy change. As in *Avery I*, we find the circuit court, and hence this Court, has subject matter jurisdiction.

## II.    Due Process

¶26.    Avery raises issues of procedural and substantive due process violations, including the University's alleged failure to provide clear reasons for her termination, the PARB's hearing format, and the PARB's not providing findings of fact in its decision.

¶27. "Both the United States and Mississippi Constitutions guarantee the right to due process of law before an administrative agency." *Flowers v. Pub. Emp. Ret. Sys. of Miss.*, 748 So. 2d 178, 180 (¶7) (Miss. Ct. App. 1999) (citing U.S. Const. amend. XIV; Miss. Const. art. 3, § 14). Further, administrative board rules "must afford minimum procedural due process which is (1) notice, and (2) opportunity to be heard." *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 318 (Miss. 1992). Substantive due process "ensures individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 984 (¶36) (Miss. 2004) (citing *Hall*, 712 So. 2d at 319). In the public employment context, in order to have a due process claim there must be a "legally cognizable property interest in . . . continued employment." *Id.* at 985 (¶38). "A protected property interest in employment exists only where the employee has an express or implied right to continued employment." *Brandon v. Claiborne Co.*, 828 So. 2d 202, 207 (¶13) (Miss. Ct. App. 2001) (quoting *White v. Miss. State Oil and Gas Bd.*, 650 F.2d 540, 541-42 (5th Cir. Unit A. May 1981)).[8] "A contract right constitutes an enforceable property interest." *Harris*, 873 So. 2d at 985 (¶37) (citing *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (¶26) (Miss. 2000)).

¶28. Here, the circuit court found Avery had no such legally protected property interest in

---

[8] In *Brandon*, the appellant was a county road manager who served at the will and pleasure of the board of supervisors and under statute could be removed by majority vote; therefore, this Court found him to be an at-will employee "not protected by the laws of due process." *Id.*

continued employment with the University; instead, she was an at-will employee. "Mississippi adheres to the employment at will doctrine, which states 'absent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible.'" *Harris*, 873 So. 2d at 986 (¶46) (quoting *Shaw v. Burchfield*, 481 So. 2d 247, 253-54 (Miss. 1985)). The circuit court also noted the University has an at-will employment policy stating employment is terminable "with or without cause."

¶29. Avery contends that there are no due process exceptions for at-will employees. Further, Avery claims the University "ambush[ed]" her on appeal by taking "the position that Avery was discharged on the sole basis that she was an at-will employee" and that the University is prohibited from "retroactively discharg[ing] her as an at-will employee." Avery concludes that the University takes this position to "sidestep clear notice and due process failures."

¶30. We agree with the circuit court that Avery's employment was at will. Avery was a non-faculty employee in the University's Development Office, without an employment contract. The University's employment policies, which are included in the appellate record, advised Avery that employment "is 'at will' and terminable 'at will' by the University or staff members with or without cause." Further, the University's Progressive Discipline Policy for Non-Faculty states that the policy "does not alter or affect the University's

16

employment at-will policy" and is "intended only to be guidelines for employment at the University . . . and do[es] not give rise to any contractual rights." The University's policies regulating progressive discipline and the grievance process retained Avery's at-will status and did not create any contract right to continuing employment. *See Byrd v. Imperial Palace of Miss.*, 807 So. 2d 433, 438 (¶18) (Miss. 2001) (finding an employee handbook that set forth grievance procedure for terminated employees did not create a contractual obligation that might override the at-will doctrine).

¶31. Avery misapprehends the application of the at-will employment doctrine to her case—it is not the "reason" she was terminated but rather defines her employment status. As stated earlier, all employment in Mississippi, absent an employment contract to the contrary, is "at will," meaning the University could terminate her with or without good reason. Having good reason to terminate Avery did not change her at-will status or the doctrine's application.

¶32. Regardless of Avery's at-will status, the circuit court properly analyzed Avery's due process claims and found she was afforded due process. The circuit court noted she was given adequate notice for the reasons of her discharge and granted a full hearing before the PARB. We agree.

### A. Lack of PARB's Findings of Fact

¶33. Avery complains that she never received the PARB's findings of fact, as  promised in a March 3, 2017 letter from the University's Human Resource Department.  The

University advised her about one month later via email that the PARB would not be providing any findings of fact. Avery therefore contends she did not know the basis for her termination. She reasons that this "procedural defect" violated the University's own policy as well as Mississippi law and underscores the lack of justification for terminating her. Therefore, she concludes that this Court has "no choice" but to vacate the PARB's decision. We disagree.

¶34. In support of her argument that the PARB's omission violated Mississippi law, Avery cites cases involving statutorily created agencies, commissions, and rules that are not applicable to the PARB. Avery cites a workers' compensation case from sixty years ago as authority that an administrative agency or commission should disclose findings of fact on which to base its decisions, *Rivers Construction Co. v. Dubose*, 241 Miss. 527, 536, 130 So. 2d 865, 869 (1961). Here, however, there is no statutory authority requiring the PARB, which is not a statutorily created administrative agency, to disclose the reason for its decision. Avery also cites to *McGowan*, where the Mississippi Supreme Court vacated and remanded a board's denial of an applicant's request for a permit to operate certain salt-water disposal wells. *McGowan*, 604 So. 2d at 313. The supreme court held that the board's failure to make adequate written findings of fact setting forth the reasons for the denial of the permit was error. *Id.* The court also noted that the board had provided by rule "that a party may, upon request, receive 'written findings of fact and conclusions of law setting forth the reasons for Board's decision.'" *Id.* at 324 n.20. However, this specific board's

18

rule, or any other agency's rule, is not applicable to the PARB, which was not created by the Legislature but by the University.

¶35. The University's Complaint and Grievance Procedure for Nonfaculty Personnel policies did not require the PARB to make findings of fact, nor does Mississippi law. Further, the March 3, 2017 letter from Human Resources promising the PARB's factual findings was not actually the University's policy. Moreover, Avery had notice of the reasons she was terminated, as will be discussed below.

### B.    Lack of Reasons for Avery's Termination

¶36. Avery argues the University failed to provide clear and consistent reasons for her termination, violating her due process. Because of this failure, she contends that she was unable to prepare an adequate defense at the PARB hearing.

¶37. In her brief, Avery lists four "sets of reasons" for her discharge that she claims are vague and inappropriate. She claims the first reason was given orally at a February 1, 2017 meeting with Buchannon and two other vice chancellors. Avery was given the choice to resign or be terminated. When asked for a reason, she was told she "engaged others in inappropriate actions"; specifically, getting other people to talk about the search for a new director of Annual Giving. The second set of reasons she claims were given in the February 23, 2017 letter from Buchannon, which Avery states "should" be controlling: "failure to improve job performance after repeated counseling and verbal and written warnings. . . . Previous supervisors have had difficult working with you" and "ethical concerns" about

19

asking individuals to assign appeal codes to the Ole Miss Fund. The third set of reasons given at the PARB hearing on March 27, 2017, two months after her termination included failure to follow the University's policy concerning attendance and leave, failure to follow directions, failure to focus on assigned tasks, and treatment of co-workers with disrespect. The fourth reason Avery claims was the "University's attempt to retroactively discharge Avery as an at-will employee," which we already have rejected. *See supra* at ¶¶28-32.

¶38. The record shows that the University repeatedly notified Avery of the reasons for her discharge, provided her an opportunity to be heard, and gave her several opportunities for rebuttal. Buchannon met with her numerous times and testified that Avery was given several oral and written warnings, "communicat[ing] clearly and specifically that her behavior at work was threatening her continued employment." For example, on November 1, 2016, Buchannon met with Avery, McClure, and Wakefield for two hours and discussed their unprofessional behavior. On November 10, 2016, Buchannon wrote Avery a letter documenting the discussions at the meeting. On December 1, 2016, Buchannon met with Avery again about her conduct, and then Buchannon gave her a written progressive discipline notice. On February 1, 2017, Buchannon and others met with Avery and gave her the option to resign instead of being terminated. Avery was reminded of Buchannon's warning for her to refrain from inappropriate actions, such as disrespectful gossip and confrontational behavior. Buchannon mentioned Avery's involving her co-workers in talks about the search for a director of Annual Giving. On February 23, 2017, Buchannon

20

provided Avery with written reasons for her termination, which included the reasons given on November 10 and December 1. Further, the University provided Avery a witness list and the documents it would rely upon one week before the PARB hearing. Avery had adequate notice of the reasons for her termination before the grievance hearing, satisfying due process.

### C. The PARB Hearing Format and Evidence

¶39. Avery complains that the format of the PARB hearing and the irrelevant evidence provided by the University violated her due process. Avery states she was required to present her case first at the hearing, thereby allowing the University to present previously undisclosed reasons for her discharge, which Avery could not rebut.

¶40. The PARB hearing lasted over eight hours—each party was granted four hours to present her/its case. Avery had legal counsel present in an advisory capacity and presented eight witnesses, provided numerous documents, and cross-examined the University's witnesses. The University presented four witnesses and numerous documents. As Avery acknowledges, there does not appear to be any legal authority concerning the burden of proof at university employment hearings. Further, there is no grievance hearing policy requiring the University to present its witnesses first. Therefore, we find no merit to Avery's claim that she was denied due process at the hearing by its format or procedure.

¶41. Avery also notes testimony was heard about events occurring in 2012 and 2014 beyond the progressive discipline policy's twelve-month limit. However, the University's

chancellor and the PARB specifically stated that they only considered evidence and documents between January 2016 and the hearing date of March 2017. We find no error in this regard. In conclusion, the circuit court did not err in finding due process requirements about the hearing were met by the University.

### D. Inadequate Investigation

¶42. Avery claims there was an inadequate investigation of her termination, thereby violating her due process right. In making this claim, Avery cites to one incident. At the PARB hearing, Andrea Jekobsons allegedly admitted there had been an incomplete investigation of Avery's alleged disrespect to co-workers during an Annual Giving meeting on November 14, 2016.

¶43. Buchannon issued a final warning to Avery in December 2016, ultimately triggered by the bad behavior Avery displayed at the November 14 meeting, where Avery, Wakefield, McClure, and Bachus were present. Wakefield had emailed Buchannon on November 17, reporting that during the meeting, Avery treated her "unfairly and unprofessionally," exhibiting such behavior as eye-rolling and scoffing at Wakefield's ideas.

¶44. Avery already had been formally warned in writing four days earlier, on November 10, about her disrespectful behavior toward Wakefield, which was observed at the November 1 meeting. Further, Buchannon had been made aware of ongoing problems and personality conflicts within the Annual Giving team. For example, Wakefield had complained that Avery and McClure had excluded her from meetings and had not responded

22

to emails. Buchannon consulted with Jekobsons about Wakefield's report of the November 14 meeting. Jekobsons investigated the report by interviewing Bachus, who was believed to be a neutral presence at the meeting. Jekobsons and Buchannon agreed that Avery warranted a final warning after her conduct November 14, as described by Wakefield and Bachus.

¶45. Avery now argues Jekobsons's investigation was inadequate because Jekobsons admitted at the PARB hearing she did not get Avery's side of the story. Further, she complains that no eyewitness to the incident was called, only Jekobsons. We are not persuaded by this argument. Jekobsons testified that while she agreed she should have asked for Avery's version of the events, Jekobsons stated that "we had our witnesses that showed that it happened," namely, Bachus and Wakefield, with Bachus deemed to be an objective witness. The record shows sufficient investigation of the incident by Jekobsons and Buchannon to satisfy due process. We conclude Avery's due process arguments do not warrant reversal.

### III.   First Amendment

¶46. Avery argues the circuit court improperly found the University did not violate her First Amendment rights. Avery claims that the University used her statements concerning the search for a director of Annual Giving as a basis for termination. Avery is referencing the after-hours conversation she secretly recorded in her office in January 2017 among her, Barnes, McClure, and Bachus and what Avery perceived as a "gross conflict of interest"

23

between a certain candidate for director and members of the search committee, namely Beyers and Buchannon.[9] Avery also contends that her termination was in retaliation for engaging in whistleblowing to Chancellor Vitter about this alleged conflict of interest even though the University found otherwise.[10]

¶47. The First Amendment prohibits a public employer from taking actions designed to suppress the rights of public employees to participate in public affairs. *Connick v. Myers*, 461 U.S. 138, 145-46 (1983). However, the speech must be a matter of public concern. *Id.* at 147. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). "It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

¶48. A retaliation claim based on the First Amendment is shown if the plaintiff can prove: "(1) [s]he suffered an adverse employment action; (2) the speech involved a matter of public

---

[9] The University characterizes this two-hour conversation as "workplace gossip."

[10] In February and March 2017, the University investigated Avery's allegations made in her February 8, 2017 letter to Chancellor Vitter to determine if she was protected by the University's whistleblower policy and whether she suffered retaliation from whistleblowing. Avery was interviewed, and at the end of March 2017, the University's Office of Equal Opportunity and Regulatory Compliance determined that while Avery might have believed the search process "was inappropriately influenced by members of the committee who had a perceived conflict of interest" and thus reported it to the chancellor, her "adverse employment action" (or termination) occurred on February 2, before her February 8 letter to Chancellor Vitter. Under this sequence of events, any alleged retaliatory employment action occurred before her reporting any alleged improper actions. Further, Avery was no longer an employee at the time she reported the alleged misconduct. Therefore, the University found she did not meet its definition of a whistleblower.

24

concern; (3) [her] interest in commenting on matters of public concern outweighs the University's interest in promoting efficiency; and (4) the speech motivated the adverse employment action." *Nichols v. Univ. of S. Miss.*, 669 F. Supp. 2d 684, 698 (S.D. Miss. 2009) (citing *Modica v. Taylor*, 465 F.3d 174, 180 (5th Cir. 2006)). An additional element is when public employees make statements under their official duties; then they are not protected by the First Amendment. *Garcetti*, 547 U.S. at 421.

¶49. The circuit court found that under *Connick* and *Garcetti*, Avery's free-speech right was not infringed upon because she signed a confidentiality agreement in January 2017, voluntarily giving up her rights to discuss the search and potential candidates in exchange for being privy to information about the search.[11] The circuit court concluded that "the University elected to restrict speech that owed its existence to Avery's professional responsibilities as a participant in the search for a new director of [A]nnual [G]iving," and not as a private citizen.

¶50. Avery maintains that she had a First Amendment right to privately discuss matters of public concern regarding the University's alleged misconduct during the search for a director. She also denies that she violated the confidentiality agreement by speaking with

_____

[11] On privacy, the agreement stated in part, "I . . . will not participate in gossip about the process or about candidates or others involved in the process." On confidentiality, the agreement provided, "I will keep private all information about search committee proceedings, identity of potential candidates, origin of candidates, and other search-related discussions, even after the search is completed. I acknowledge that the search committee chair is the only person authorized to speak on behalf of the committee."

Barnes, McClure, and Bachus about the search and recording the conversation. Avery contends that even if she did violate the agreement, it was inapplicable because she was not an actual member of the search committee. Avery claims that merely signing the confidentiality agreement does not allow her First Amendment rights to be violated. Avery concludes her speech was protected by the First Amendment.

¶51. The circuit court did not err in finding Avery voluntarily gave up her First Amendment rights to discuss the search by signing the confidentiality agreement. The agreement applied to Avery because she signed it before her request to be on the search committee was declined. Further, handwritten notes on the agreement stated that while Avery would not be on the committee formally, she would be allowed to interview the candidates one on one.

¶52. The circuit court found Avery's speech was made under her official duties and not as a private citizen; thus, it was unprotected speech under *Garcetti*.[12] We agree. Avery complained to her co-workers about what she perceived was a conflict of interest between a candidate and search committee members. Avery was involved in the search due to her employment, even though she was not a formal committee member. Therefore, Avery's speech occurred during the scope of her employment, even though the speech was "after hours."

---

[12] The circuit court did not address whether Avery's speech was a matter of public concern because it determined she did not make the speech as a private citizen.

¶53. Lastly, there is no indication the University retaliated against Avery for whistleblowing. As the University's investigation concluded, Avery wrote her "whistleblower email" to Chancellor Vitter after she was terminated; therefore, the email could not be a reason for her termination.

¶54. The circuit court properly found Avery's termination did not violate her First Amendment rights.

### IV. Substantial Evidence

¶55. Avery does not make a distinct argument about the lack of substantial evidence beyond reiterating her previous argument about disrespecting co-workers and the ethical issues for changing appeal codes to the Ole Miss Fund. She claims both of these matters were refuted by witnesses at the PARB hearing.

¶56. The circuit court found substantial evidence supported the PARB's decision to terminate Avery. The court cited the November 10 and December 1 letters to Avery about disrespectful and confrontational behavior toward co-workers, as well as extensive testimony from Buchannon, Avery's supervisor, supporting her termination. The circuit court did not err in finding substantial evidence supported Avery's termination.

¶57. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**